MODIFIED: AUGUST 24, 2017
CORRECTED: APRIL 1, 2016
RENDERED: MARCH 17, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

2013-SC-000560-DG

FLOYD LAWRENCE PATTON, AS
ADMINISTRATOR OF THE ESTATE OF
STEPHEN LAWRENCE PATTON

APPELLANT

ON REVIEW FROM COURT OF APPEALS

V.                     CASE NO. 2012-CA-000598
FLOYD CIRCUIT COURT NO. 08-CI-00653

DAVIDA BICKFORD, PAUL FANNING,
RONALD "SONNY" FENTRESS, JEREMY
HALL, ANGELA MULLINS, LYNN
HANDSHOE, AND GREG NICHOLS

APPELLEES

**OPINION OF THE COURT BY JUSTICE VENTERS**

**AFFIRMING**

Stephen Patton (Stephen) was an eighth-grader at Allen Central Middle

School (ACMS) when he committed suicide, allegedly because he was being

bullied at school.[1] Sheila Patton, as Administratrix of Stephen's estate,[2] filed

---

[1] This Court initially rendered an opinion in this case on March 17, 2016, affirming the Court of Appeals. A petition for rehearing and/or modification of opinion was filed by Stephen's estate pursuant to CR 76.32. This opinion is the result of that reconsideration.

[2] Stephen's mother, Sheila Patton, was the original personal representative of his estate. She died during the reconsideration of our original opinion and Floyd

this lawsuit alleging various teachers[3] and administrators[4] knew of, or should have known of, the bullying and taken steps to prevent it.

The circuit court granted summary judgment in favor of the Teachers and the Administrators, ruling that they were entitled to the protection of qualified official immunity from this lawsuit. The circuit court also held that Stephen's suicide was a superseding intervening cause interrupting any potential liability of the Teachers and Administrators, and thus, the Estate could not succeed in its claims, in any event.

The Court of Appeals upheld the summary judgment solely on the intervening cause issue. The Court of Appeals disagreed with the circuit court's ruling on qualified official immunity, holding that neither the Administrators nor the Teachers were immune from liability because the duties of both of these sets of defendants were ministerial in nature.

We disagree with the Court of Appeals and hold that the trial court correctly determined that the Administrators were protected by qualified immunity and entitled to summary judgment on that ground. We also conclude that the Teachers are not immune from suit on the basis of qualified official immunity. We further conclude that the Estate presented multiple

---

Lawrence Patton was substituted as her successor. We refer to Stephen Patton's estate as "the Estate" throughout this opinion.

[3] "The Teachers" collectively refers to Appellees Jeremy Hall, Angela Mullins, Lynn Handshoe, and Greg Nichols, all teachers at ACMS.

[4] "The Administrators" collectively refers to Appellees Davida Bickford (ACMS Principal), Paul Fanning (Floyd County School Superintendent), and Ronald "Sonny" Fentress (Floyd County School Superintendent).

affidavits from ACMS students attesting that Stephen was persistently bullied at school and that the Teachers were aware of it, thus creating a genuine issue of material fact concerning whether the Teachers were negligent either in their duty to supervise their pupils or in their duty to handle bullying reports appropriately.

Contrary to the holdings of the lower courts, we further determine that bullying and tormenting behavior, if shown to be the proximate cause of a suicide, may form the basis for a wrongful death claim by the decedent's estate.

Nevertheless, under the facts and circumstances as presented in the record before us, we further hold that the Estate has failed to make a *prima facie* showing that the Teachers' conduct of failing to prevent the bullying of Stephen Patton was the cause-in-fact (the "but-for" cause) or the proximate cause of Stephen's suicide. For that reason, summary judgment in favor of the Appellee Teachers was required.

In summary, while we reject the Court of Appeals' determinations that the Teachers were cloaked with qualified official immunity and that suicide is a superseding intervening event that necessarily severs any potential liability for bullying, we affirm its opinion to uphold the summary judgment. However, we do so for substantially different reasons.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Thirteen-year old Stephen Patton was a well-liked, personable young man in the eighth grade at Allen Central Middle School (ACMS) in Floyd County. At six feet, three inches in height, and weighing 196 pounds, Stephen

3

was large for his age. He was physically awkward, he had a stuttering problem, he had more facial hair than most eighth graders, and at times he dressed unconventionally. Stephen had suffered from migraine headaches since the age of six, and his doctor had recently indicated that Stephen may have agoraphobia—an abnormal fear of open, public spaces. He was also bothered by noise, and at the time of the suicide, his school's family planning program was using noisy crying-baby simulators which apparently aggravated his discomfort.

Whether Stephen was actually bullied by his peers and, if so, whether Appellees were aware of the bullying, are disputed issues of fact. Whether the bullying to which he may have been subjected induced him to commit suicide is also a disputed factual issue. The Teachers' and Administrators' evidence suggested that the underlying cause of Stephen's suicide was linked to the chronic pain he suffered due to persistent migraine headaches, or alternatively, that he suffered from a mental disorder which led to the suicide.

The Estate's complaint alleged that both the Administrators and Teachers were negligent in discharging their duties to Stephen. The Estate claimed that the Teachers knew, or should have known, that Stephen was being bullied and mistreated by other students under their watch and they failed to do anything to stop it, and the Administrators failed to implement sound policies to address bullying at ACMS and proper protocols for student supervision.

4

## II. STANDARD OF REVIEW

Summary judgment is a remedy to be used sparingly, *i.e.* "when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (citations omitted). We frequently caution, however, the term "impossible" is to be used in a practical sense, not in an absolute sense. *See id.* (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992)). The trial court's primary directive in this context is to determine whether a genuine issue of material fact exists; if so, summary judgment is improper. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). This requires that the facts be viewed through a lens most favorable to the party opposing summary judgment, here the Estate. *Id.* It is important to point out that "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482.

A motion for summary judgment presents only questions of law and "a determination of whether a disputed material issue of fact exists." *Shelton*, 413 S.W.3d at 905. Our review is de novo, and we afford no deference to the trial court's decision.

5

## III. SCHOOL ADMINISTRATORS MAKING SCHOOL POLICIES HAVE QUALIFIED OFFICIAL IMMUNITY; TEACHERS IMPLEMENTING SCHOOL POLICIES DO NOT

We begin by more clearly delineating the Estate's arguments. The Estate asserts that the Teachers, and to a limited extent the Administrators, negligently supervised students and failed to follow school policy, which resulted in a culture of bullying at ACMS. The Estate also alleges that the Teachers and Administrators were negligent because students told them that Stephen was being bullied and they did nothing to stop it. The latter claim focuses on the negligent implementation of the school's policies. The Teachers and Administrators respond that, regardless of their alleged negligence, the Estate's claims should be dismissed because they are entitled to qualified official immunity.

The application of qualified official immunity to particular activities has long been problematic and this case is no different. Qualified official immunity, generally speaking, is "immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions."[5] *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). Qualified immunity applies only to the negligent performance of duties that are discretionary in nature. A government official is not afforded immunity from tort liability for the negligent performance of a ministerial act. The act of "governing cannot be a tort, but failing to carry out the government's

---

[5] Under certain conditions, immunity can be absolute.

commands properly when the acts [to be performed] are known and certain can be." *Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014).

Categorizing actions as either the performance of a discretionary duty or the performance of a ministerial duty is vexing to litigants and courts alike. We recently affirmed that the distinction "rests not on the status or title of the officer or employee, but on the function being performed. Indeed, most immunity issues are resolved by examining the nature of the functions with which a particular official or class of officials has been lawfully entrusted." *Id.* at 296-297 (internal quotes and citation omitted). A somewhat rudimentary expression of the distinction between discretionary and ministerial acts provides that "[p]romulgation of rules is a discretionary function; enforcement of those rules is a ministerial function." *Williams v. Kentucky Department of Education*, 113 S.W.3d 145, 150 (Ky. 2003) (citations omitted). This is, of course, too simple for most circumstances, but it serves as a sound point from which to begin.

A ministerial duty is one that "requires only obedience to the orders of others." *Marson*, 438 S.W.3d at 297 (quoting *Yanero*, 65 S.W.3d at 522). In other words, a duty is ministerial "when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* Be that as it may, a ministerial duty does not demand the simple rote application of a set of rules. A ministerial duty may involve "ascertainment of . . . facts," *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. 1959), and an officer may be permitted "some discretion with

7

respect to the means or method to be employed," *id.*; *see also* 63C Am. Jur. 2d *Public Officers and Employees* § 319 (2016) ("Even a ministerial act requires some discretion."). The point is that a government official performing a ministerial duty does so without particular concern for his own judgment; or, as we said in *Marson,* the act is ministerial "if the employee has no choice but to do the act." 438 S.W.3d at 297.

In contrast, discretionary acts or duties are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Knott County Board of Education v. Patton,* 415 S.W.3d 51, 57 (Ky. 2013) (quoting *Yanero,* 65 S.W.3d at 522). In *Yanero,* the seminal case in this arena, we described discretionary acts as "good faith judgment calls made in a legally uncertain environment." 65 S.W.3d at 522. The underlying rationale for providing immunity to discretionary acts is that "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Id.* at 519. This rationale makes clearer that discretionary acts are those performed at the policy-making level, but acts performed at the operational level are included within this category as well.

## A. The Administrators Were Entitled to Qualified Official Immunity as to the Estate's Claim that ACMS's Policies Were Inadequate.

The Administrators, with perhaps the exception of Principal Bickford in very limited circumstances, were not tasked with supervising students.[6] The Estate does not contend the Administrators negligently supervised or monitored students; rather, the Estate faults the Administrators for not promulgating adequate policies, and otherwise, for not following the policies they had enacted.

In promulgating behavioral policies for schools, the Administrators operated under a legislative directive requiring "each local board of education" to "formulat[e] a code of acceptable behavior and discipline to apply to the students in each school operated by the board." KRS 158.148(4) (currently codified within KRS 158.148(5)(a)); see also KRS 158.440. The legislative mandate to formulate a code of student behavior does not cast the formation of particular code provisions as a ministerial function. We dealt with this question in *Knott County Board of Education*, where school administrators had a statutory duty to adopt a school curriculum and establish a policy for assessing curriculum needs. The duty to adopt a curriculum was held to be a ministerial duty because it was mandated by statute, but the policy choice of what subjects to include within the curriculum (i.e., whether to teach Spanish

---

[6] In her deposition, for example, Principal Bickford acknowledged that she would aid in supervising the cafeteria when a sufficient number of teachers was not available. Normally, ACMS had at least two teachers—three on most occasions—supervising the cafeteria during lunchtime (roughly 100 students). If a teacher had to leave the cafeteria for some reason or was otherwise unavailable to supervise lunchtime, Principal Bickford acknowledged she would help.

9

or French when neither was mandated by law) was held to be a discretionary duty to which qualified immunity attached. 415 S.W.3d at 58.

Such is the case here. The duty to implement a code of appropriate student behavior was a ministerial duty. The Administrators complied by enacting extensive policies regarding bullying and harassment. The choice of specific provisions and the assessment of their adequacy to address all concerns are purely of a discretionary character.[7] Consequently, the Administrators are entitled to qualified official immunity against the Estate's claim that the policies were inadequate.

## B. The Administrators Were Entitled to Summary Judgment on the Estate's Failure to Supervise Claim, but the Teachers Were Not.

Before reviewing the claims that the Administrators failed to follow the very policies they promulgated, a claim closely related to the Estate's claim that the Teachers negligently supervised students, an overview of the policies ACMS had in place to prevent or resolve harassment is helpful.

The ACMS policy clearly expressed its intention to create a safe school environment for students. Critical to the success of that goal was the elimination and prevention of bullying:

> What parents want most is for their children to be safe on their way
> to/from and at school. When a child does not feel safe at school, it

---

[7] To the extent that the Estate argues that Administrators were negligent in implementing the policies by not filing proper reports, supervising students, or otherwise failing to create a healthy culture within ACMS and the Floyd County School System, this argument is refuted by the record. The record attempts to highlight each of the Administrators' deviations, regardless of degree, from the strict language of the policy. A *prima facie* claim of negligence fails, however, because the record is devoid of any connection between these deviations and bullying that occurred at ACMS or bullying endured by Stephen.

10

affects other areas of that child's life. Students who feel anxious about their personal safety are sometimes reluctant to attend. Once students and community are aware that bullying is not tolerated at school, students will be less guarded and concentrate more on learning than staying safe. The victim, the bully, as well as witnesses to bullying acts are more comfortable when they know the community, students, staff and administration stand together against bullying. Our school will then be viewed as a safe school.

The ACMS code of conduct included the following definition: "Bullying is defined as (but not limited to) communicating verbally and nonverbally using: teasing; mocking; sending/writing negative/hurtful notes; rude/negative/hurtful/off color comment; rude gestures/ 'flipping off' another person; isolating another from a group."[8] The school's code of conduct also included the following physical acts as examples of bullying "on school property, at any school function, or on school transportation[:]

- Grabbing;
- Pinching;
- Twisting body parts;
- Tripping;
- Pushing;
- Shoving;
- Flip/throw/toss objects at another student;
- Poking;
- Punching;
- Kicking;
- Hiding or damaging another student's property."

These specified acts are expansive, to be sure, but the policy provides a clear illustration of prohibited conduct.

The ACMS policy requires school staff, including teachers and administrators, who observe bullying or receive a report of bullying, to report

---

[8] Bullet points omitted.

11

the incident to their supervisor: "all bullying [behaviors] as defined [above] WILL be reported for investigation." A multilateral general investigative process then followed: (1) "Report bullying incident to principal or designee for investigation"; (2) "Principal or designee investigates"; and (3) "Documentation of evidence is gathered and evaluated." After the investigation, if the report is substantiated, the student found to have bullied is disciplined from a range of possible penalties.

In addition to the actual policy language, ACMS also took steps to train its staff to recognize bullying and to raise awareness among its student body and their parents on matters related to bullying. The bullying policy was read aloud to students by teachers on the first day of school; the policy was distributed to students so they could take it home for parents to review; students were surveyed during the first week of school and asked to respond anonymously regarding who they perceived as potential bullies for the upcoming school year; an anti-bullying program was presented each year; anti-bullying posters were hung throughout the school; and a box was placed outside Principal Bickford's office so that students could submit anonymous claims of bullying. If a student was reported as bullying, or if a student was the victim of bullying, parents were notified.

Particular to the Teachers and Administrators (especially Principal Bickford), ACMS conducted various professional development programs to further educate personnel on the importance of bullying prevention and detection. Before the first day of the school year, ACMS personnel were

12

informed of their responsibility to nurture a positive classroom environment and follow appropriate discipline procedures. Likewise, personnel received training on bullying via a PowerPoint presentation and training on appropriate management of classroom behavior, which predictably, included strategies for dealing with bullying and harassment.

This case mirrors our recent decision in *Marson* in important ways. We noted in *Marson* that school principals have a "duty to provide a safe school environment, but they are not insurers of children's safety." 438 S.W.3d at 299. The duty is discretionary because it is "so situation specific, and because it requires judgment rather than a fixed, routine performance." *Id.* Ordinarily, the duty is "exercised most often by establishing and implementing safety policies and procedures." *Id.* There is a "qualitative difference in actually [supervising students] and assigning someone to fill that task." *Id.* The Administrators are a degree removed from the actual execution of the policies. Instead, their role is to monitor the implementation of the policies and react as needed.[9] Disciplining students for policy violations is likewise a discretionary function.

Principal Bickford had only a general supervisory duty over the students. Although at times she helped to monitor the cafeteria during lunchtime, her role as principal did not entail the specific supervision required of the

---

[9] Again, as we outlined in *Marson*, the Administrators "had a general rather than a specific duty, [which] requir[ed] them] to act in a discretionary manner by devising school procedures, assigning specific tasks to other employees, and providing general supervision of those employees." 438 S.W.3d at 299.

13

Teachers. With respect to the allegations that the policies were negligently implemented, the Administrators are entitled to qualified official immunity.

The Teachers, on the other hand, were tasked not with the promulgation of policy, but with its enforcement. We have consistently held that the general supervision of students by teachers is ministerial in nature "as it requires enforcement of known rules." *Marson*, 438 S.W.3d at 301 (citing *Williams*, 113 S.W.3d at 150). In fact, we have only labeled the duty of supervision to be discretionary in two cases illustrating the same factual scenario. The distinguishing factor in those cases was that the supervisory official was given little or no direction or guidance on how the supervision was to be performed. *See Haney v. Monsky*, 311 S.W.3d 235 (Ky. 2010); *Rowan County v. Sloas*, 201 S.W.3d 469 (Ky. 2006). Unlike those situations, the Teachers here received ample training on the policies and instructions on what to look for during their supervision to detect bullying. This is not a situation in which an officer performed a governmental act that was "not prescribed" or was left "without clear directive." *Marson*, 438 S.W.3d at 302.

We acknowledge the unique circumstances presented by a school environment. We have recognized "that teachers maintain the discretion to teach, supervise, and appropriately discipline children in the classroom." *Turner v. Nelson*, 342 S.W.3d 866, 876 (Ky. 2011). To succeed, teachers "must have appropriate leeway to do so, to investigate complaints by parents, or others, as to the conduct of their students, to form conclusions as to what actually happened, and ultimately to determine an appropriate course of

14

action, which may at times, involve reporting the conduct of the child to the appropriate authorities." *Id.* To be sure, there is a degree of discretion associated with the Teachers' duties here. But this discretion does not in and of itself transform an otherwise ministerial duty to a discretionary one.

The duty to report bullying is clearly ministerial, but it could be argued that determining whether bullying is occurring requires judgment and is, therefore, discretionary. However, our case law disagrees. "That a necessity may exist for the ascertainment of . . . facts does not operate to convert the act into one discretionary in nature." *Upchurch*, 330 S.W.2d at 430. A degree of discretion "with respect to the means or method to be employed" in the performance of a duty does not strip away the ministerial nature of the duty. *Id.*

We reiterated that rule in *Marson*. Recasting an otherwise ministerial duty as discretionary simply because it required some modicum of discretion of judgment "would undermine the rule that an act can be ministerial even though it has a component of discretion." 438 S.W.3d at 302. The discretion inherent in the ministerial duty in *Marson* was arguably greater than that found here. In *Marson*, the teacher's ministerial task of "bus duty" included "looking out for [the children's] safety" or, in the teacher's own words, looking out for "any kinds of safety things that might cause problems for the kids." *Id.* at 300, 302. There was no formal policy or guideline that defined "safety things" to alert the teacher to specific potential safety issues. The need to use common sense and ordinary judgment to avoid negligence did not convert the

task to a discretionary duty. The Teachers in this instant case exercised *less* discretion than the teacher in *Marson* because bullying was expressly defined and the policy *required* the conduct consistent with that definition be reported.

Our research discloses only one instance in which we determined a teacher's supervisory duty which combined a ministerial task with a degree of discretion to be a discretionary duty. *Turner v. Nelson*, 342 S.W.3d 866 (Ky. 2011), is an atypical case. *Turner* involved a kindergarten teacher with statutory duty to report suspected sexual abuse *if* she knew or had reasonable cause to believe that a child was abused. *Id.* at 877. The alleged abuse involved a five-year old kindergartener's touching of a five-year old playmate. Determining whether to report the incident as sexual abuse required investigating the facts, weighing the credibility of the children, and exercising judgment to discover if the alleged actions of the five-year old could even qualify as "sexual abuse." The degree of discretion required is evident and clearly outweighs the ministerial duty of making a binary decision to report the incident or not. This case is far different. ACMS policy provided a list of specific conduct considered to be bullying and required the reporting of *any* listed act. No discretion or judgment was required to determine if specific conduct qualified as bullying. *Turner* is different and so it results in a different conclusion.

The duty of the Teachers to report bullying was ministerial and so they lack the protection of qualified immunity. That is, of course, not to say they are liable. They, and others similarly situated, may have defenses; they simply

16

are not *immune* from suit. Plaintiffs have the burden of establishing a *prima facie* case of negligence in the breach of the applicable ministerial duty.

Having determined that under the circumstances of this case, the Teachers are not immune from suit, we next examine whether there is a genuine issue of material fact which would necessitate this case proceeding to trial. The Teachers claim that summary judgment is proper because the Estate failed to produce evidence to show that Stephen was bullied, which is a necessary prerequisite for the Teacher's duty to report the bullying to be triggered. Affidavits submitted by the Estate in opposition to summary judgment are replete with averments asserting that Stephen was bullied and that school personnel knew or should have known about it: "Stephen was bullied every day in the lunch room"; the bullies would steal items daily from his lunch box and scatter what they didn't want on the floor; the bullies would make fun of Stephen's stuttering and cowboy boots; Ms. Bickford was told about the bullying but "blew us off"; "I have personally seen Stephen Patton being bullied"; "I witnessed both physical and verbal bullying of Stephen"; "I saw Stephen get hit and jumped on"; "In the hallways, lined up to go to lunch, the teachers would be in the hallways when people would make fun of Stephen's stutter and the teachers would not say or do anything about it"; and "From what I witnessed, the bullying of Stephen Patton at ACMS was not taken seriously and generally ignored by adults at Allen Central Middle School"; etc.

The incorporation of these affidavits into the *Steelvest* analysis makes it immediately clear that a genuine issue of material fact exists concerning

17

whether Stephen was bullied as claimed by the Estate and whether the Teachers knew, or should have known about it, and thereby violated their ministerial duty to stop it and report it. On this point the Estate has adequately met its burden under *Steelvest.*

## IV. CAUSATION: SUICIDE AS A SUPERSEDING INTERVENING EVENT

Appellees have argued at all stages of the litigation that they cannot be held liable for Stephen's suicide because suicide is, as a matter of law, a superseding intervening event, legally independent of any negligence they may have committed with respect to the alleged bullying. Both the circuit court and the Court of Appeals agreed with Appellees, holding that suicide is always a superseding intervening event except in three instances, which do not include bullying.

We disagree. As further discussed below, we determine that bullying (and similar behavior intended to torment another person) may form the basis of a wrongful death claim when death by suicide is a direct consequence. In such instances, suicide is not intrinsically a superseding and intervening event which under all circumstances terminates the liability of those whose conduct led to the death. Under Kentucky law, bullying may qualify as an exception to the rule that generally regards suicide as a superseding intervening event.

The Estate's wrongful death claim against the Teachers is, at its core, a tort claim based upon negligence. The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages. *Pathways, Inc. v. Hammons,* 113 S.W.3d

18

85, 88 (Ky. 2003) (citing *Mullins v. Commonwealth Life Insurance Co.*, 839 S.W.2d 245, 247 (Ky. 1992)). Duty presents a question of law, whereas breach and injury are questions of fact for the jury to decide. *Id.* at 89 (citations omitted). Causation presents a mixed question of law and fact. *Id.* (citing *Deutsch v. Shein*, 597 S.W.2d 141, 145 (Ky. 1980)[10]).

As stated above, the Teachers had a duty to supervise students so as to prevent bullying, to stop bullying as it occurred, and to report bullying to the Administrators if it occurred. As noted above, a genuine issue of material fact exists as to whether the Teachers' acts and omissions breached that duty. As to the final element of the tort damages, Stephen's anguish suffered before his death and the destruction of his power to earn due to his death are compensable damages if the suicide is traceable to bullying by his fellow students and the corresponding negligence of the Teachers in failing to stop it. The Estate has incontestably presented evidence sufficient to survive summary judgment as to the first, second, and fourth elements of a tort negligence claim.

Causation is the element remaining for which it must be determined whether a genuine issue of material fact exists. Causation consists of two distinct components: "but-for" causation, also referred to as causation in fact, and proximate causation. "[L]iterally speaking there can never be only one 'cause' of any result. Every cause is a collection of many factors, some identifiable and others not, all determined by prior events. The law seeks out

---

[10] Abrogated on other grounds by *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012).

19

only the collective cause or causes for which it lays responsibility on some person or persons." *House v. Kellerman*, 519 S.W.2d 380, 382 (Ky. 1974). But-for causation requires the existence of a direct, distinct, and identifiable nexus between the defendant's breach of duty (negligence) and the plaintiff's damages such that the event would not have occurred "but for" the defendant's negligent or wrongful conduct in breach of a duty. "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176-177 (2009) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* 265 (5th ed. 1984)).

Aside from many well-documented anecdotal accounts attributing suicide to bullying, there is also a growing professional consensus suggesting that torment experienced from being bullied by one's peers can produce, for some individuals, such severe emotional distress and depression that suicide is seen as the only means to escape the agony. *See e.g., Dunkley v. Board of Education of the Greater Egg Harbor Regional High School*, 2016 WL 6134518 at *9 (D.N.J. 2016) ("the chronic persistence of school bullying has led to student suicides across the country"); Neil Marr and Tim Field, *Bullycide: Death at Playtime - An Exposé of Child Suicide Caused by Bullying* (Success Unlimited 2001). We readily conclude that bullying in severe cases may produce such an extreme emotional response that an individual is driven to find refuge in suicide, and so under the proper circumstances, bullying may satisfy the but-for component of the causation element.

20

But-for causation is a factual question to be answered in an individual case by the factfinder deciding if the defendant's conduct was a "substantial factor" in causing the suicide. *Restatement (Second) of Torts* § 431 (1965) ("The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."); *Deutsch v. Shein*, 597 S.W.2d 141;[11] *Claycomb v. Howard*, 493 S.W.2d 714, 718 (Ky. 1973); *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 77 (Ky. 2010). For example, were this case to reach that stage, the jury in this case would be asked to determine whether it believed from the evidence presented that the Teachers' failure to prevent, to stop, or to report the bullying was a substantial factor in causing Stephen's suicide.

The other aspect of causation is proximate causation. Proximate causation captures the notion that, although conduct in breach of an established duty may be an actual but-for cause of the plaintiff's damages, it is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability upon the defendant. "Proximate cause is bottomed on public policy as a limitation on how far society is willing to extend liability for a defendant's actions." *Ashley County, Arkansas. v. Pfizer, Inc.*, 552

---

[11] Abrogated on other grounds by *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012).

21

F.3d 659, 671 (8th Cir. 2009). Accordingly, proximate causation is regarded as an issue of law to be decided by the courts.

An important appendage of proximate causation analysis is the superseding intervening cause doctrine.[12] *See Restatement (Second) of Torts* §§ 440-453. As with the determination of proximate cause generally, "whether an undisputed act or circumstance was or was not a superseding cause is a legal issue for the court to resolve, and not a factual question for the jury." *House*, 519 S.W.2d at 382. "By its nature, the question must be decided empirically, on a case-by-case basis, and cannot be practically fitted into instructions to juries." *Id.*; *cf. McCoy v. Carter*, 323 S.W.2d 210, 215 (Ky. 1959) ("The question of proximate cause in connection with the occurrence of an accident is one of fact to be left to the jury where such cause is open to a reasonable difference of opinion. Stated somewhat differently, the issue of proximate cause should be withheld from the jury only if there is no dispute about the essential facts and but one conclusion may reasonably be drawn from the evidence.").

Courts apply the superseding intervening cause doctrine by determining whether the chain of causation applicable to a defendant's conduct has been broken by "facts [that] are legally sufficient to constitute an intervening cause." *Montgomery Elevator Company v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984). Facts sufficient to constitute a superseding intervening cause "are facts of such 'extraordinary rather than normal,' or 'highly extraordinary,' nature,

---

[12] Also known as superseding cause, intervening cause, and supervening cause.

22

unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim." *Id.* (quoting *House*, 519 S.W.2d at 382).

Generally, in the past, courts did not accept suicide as a foreseeable consequence of otherwise tortious behavior.

> Courts have long been rather reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act. *See, e.g., Scheffer v. Washington City V.M. & G.S.R.R.*, 105 U.S. 249, 26 L.Ed. 1070 (1882). Generally speaking, it has been said, the act of suicide is viewed as 'an independent intervening act which the original tortfeasor could not have reasonably [been] expected to foresee.' *Stasiof v. Chicago Hoist & Body Co.*, 50 Ill.App.2d 115, 122, 200 N.E.2d 88, 92 (1st Dist.1964), *aff'd sub nom. Little v. Chicago Hoist & Body Co.*, 32 Ill.2d 156, 203 N.E.2d 902 (1965), as quoted in *Jarvis v. Stone*, 517 F.Supp. 1173, 1175 (N.D.Ill. 1981).

*Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990) (manufacturer of "Dungeons & Dragons" game held not negligent in marketing the game to "mentally fragile persons" and the teenager's suicide was an intervening cause of his death); *see also Epelbaum v. Elf Atochem, North America, Inc.*, 40 F. Supp. 2d 429, 431 (E.D. Ky. 1999); *Jutzi-Johnson v. United States*, 263 F.3d 753, 755 (7th Cir. 2001); *Beul v. ASSE International, Inc.*, 233 F.3d 441 (7th Cir. 2000); *McMahon v. St. Croix Falls School District*, 596 N.W.2d 875, 879 (Wis. App. 1999); *Wyke v. Polk County School Board*, 129 F.3d 560, 574–575 (11th Cir. 1997); *Bruzga v. PMR Architects, P.C.*, 693 A.2d 401 (N.H. 1997); *Edwards v. Tardif*, 692 A.2d 1266, 1269 (Conn. 1997). And as noted by Prosser and Keeton:

> if one is sane, or if the suicide is during a lucid interval, when one is in full command of all faculties, but life has become unendurable by reason of the injury, it is agreed in negligence

23

cases that the voluntary choice of suicide is an abnormal thing, which supersedes the defendant's liability.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 44, 311 (5th ed. 1984).[13]

The foregoing precedent and other similar authorities led the circuit court and the Court of Appeals to hold that Stephen's suicide was a superseding intervening event, outside the range of the recognized exceptions, and thus acted to cut off liability arising from any negligent breach of duty attributable to the Appellees.

But, as reported in *Corpus Juris Secundum*, the general rule regarding suicide as a superseding intervening event does not apply to conduct that, by negligence or intent, foreseeably induces a suicidal reaction: "A wrongful death action will lie for damages from the suicide of another where the defendant is found to have actually caused the suicide or where the defendant is found to have had a duty to prevent the suicide from occurring." 25A C.J.S. *Death* § 68 (2017). "[A]ctions are allowed where the defendant is found to have actually caused the suicide, such that the defendant's conduct led to the decedent's death by suicide, and the death was a natural and probable consequence of the

---

[13] Citing *Arsnow v. Red Top Cab Co.*, 292 P. 436 (Wash. 1930); *Tucson Rapid Transit Co. v. Tocci*, 414 P.2d 179 (Ariz. App. 1966); *Lancaster v. Montesi*, 390 S.W.2d 217 (Tenn. 1965); *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88 (Ill. App. 1964); *Wallace v. Bounds*, 369 S.W.2d 138 (Mo. 1963); *McLaughlin v. Sullivan*, 461 A.2d 123 (N.H. 1983). *See also Jamison v. Storer Broadcasting Co.*, 511 F. Supp. 1286, 1291-1292 (E.D. Mich. 1981); *Halko v. New Jersey Transit Rail Operations, Inc.*, 677 F. Supp. 135, 142 (S.D.N.Y. 1987); and *Rodriguez v. Admiral Lee Towing Inc.*, 103 F.3d 124 (5th Cir. 1996).

defendant's conduct and was a foreseeable consequence of the tortfeasor's acts." *Id.* (citations omitted).

Similarly, *American Jurisprudence, Second* states:

Liability may also exist because the defendant actually caused the suicide. Moreover, it has also been held that a tortfeasor may be held liable for the suicide of a person that is the result of a tortfeasor's negligent conduct provided the suicide is a foreseeable consequence of the tortfeasor's acts.

Indeed, in examining proximate causation in order to determine if suicide is an intervening cause, the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. A plaintiff can alternatively show that the defendant's negligence was the proximate cause of the suicide by presenting evidence that the decedent's suicide was the natural and probable consequence of the injury he or she suffered at the hands of the defendant.

22A Am. Jur. 2d *Death* § 41 (2017) (citations omitted).

While the question has not been previously addressed by this Court, at least one Kentucky court has upheld a plaintiff's wrongful death claim against a defendant based upon an underlying suicide. In *Sudderth v. White*, 621 S.W.2d 33 (Ky. App. 1981), the Court of Appeals held that a defendant may be held responsible for a resultant suicide when a person known to be suicidal is placed in his direct care and he then negligently fails to take appropriate measures to guard against the foreseeable suicide.[14]

---

[14] In the worker's compensation context where the foreseeability of the harm caused by a work-related injury is not a decisive factor, the Kentucky Court of Appeals held that a worker's suicide was compensable under the workers' compensation act as an injury sustained in the course of the worker's employment if it resulted from a

25

Upon our review of this issue, and as noted above, we are mindful that bullying as a source of torment has been recognized as a foreseeable cause of suicide and medical/psychological professionals now widely acknowledge this societal concern. Our legislature has responded to these concerns by enacting so-called "bullying bills" which, among other things, mandate that school teachers be trained in suicide prevention policies. *See e.g.*, KRS 158.070(3)(b) ("[A] minimum of two (2) hours of self-study review of suicide prevention materials shall be required for all high school and middle school principals, guidance counselors, and teachers each school year."); KRS 156.095(6).[15] In advancement of the public policy expressed by the legislature in these bullying bills, the Kentucky Department of Education has incorporated a significant volume of information relating to school bullying on its website,[16] including an entry relating to a "Dear Colleague" letter from the United States Department of

---

work-related mental disorder sufficient to impair the worker's normal and rational judgment. *Wells v. Harrell,* 714 S.W.2d 498 (Ky. App. 1986).

[15] KRS 156.095(6) provides:

(a) By August 1, 2010, the Kentucky Cabinet for Health and Family Services shall post on its Web page suicide prevention awareness information, to include recognizing the warning signs of a suicide crisis. The Web page shall include information related to suicide prevention training opportunities offered by the cabinet or an agency recognized by the cabinet as a training provider.

(b) By September 1, 2010, and September 1 of each year thereafter, every public middle and high school administrator shall disseminate suicide prevention awareness information to all middle and high school students. The information may be obtained from the Cabinet for Health and Family Services or from a commercially developed suicide prevention training program.

[16] *See generally* http://education.ky.gov/pages/search.aspx?terms= bullying&affiliateId=EDUCATION (August 2017).

26

Education which includes the statement: "As you know, student suicides resulting from the bullying and harassment activities of other youths have escalated in the recent past and much of the focus has been on school knowledge of and response to the bullying and harassing behavior."[17]

These expressions of the legislature and associated state agencies reflect a public policy decision to stop bullying in schools. As noted above, "[p]roximate cause is bottomed on public policy as a limitation on how far society is willing to extend liability for a defendant's actions." *Ashley County, Arkansas*, 552 F.3d at 671. Moreover, the historic purpose of tort law as it has evolved throughout our common law tradition has been the discouragement of harmful socially unacceptable behavior by imposing liability upon the wrongdoer for the wrong done.

Finally, we heed as we must the language of Section 241 of the Kentucky Constitution, which establishes a cause of action for wrongful death. Section 241 states in pertinent part: "[w]henever the death of a person shall result from an injury inflicted by negligence or a wrongful act, then, *in every such case,* damages may be recovered for such death, from the corporations and persons so causing the same." (Emphasis added.) If a person's death by suicide was wrongfully induced by torment negligently or intentionally inflicted by bullying, or by a negligent failure to prevent, stop, or report the bullying when there is a duty to do so, and we are bound by the constitutional mandate to acknowledge

---

[17] http://education.ky.gov/school/sdfs/Pages/Letter-from-Office-of-Civil-Rights-Bullying.aspx (August 2017).

27

the wrongful death claim *in every such case,* then we must do so in the case of negligently or intentionally-induced suicide. Section 241 is codified in KRS 411.130(1), the wrongful death statute, which provides as follows:

> Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, *damages may be recovered for the death from the person who caused it,* or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased.

(Emphasis added.) KRS 411.130(1) reflects the language of Section 241, and its plain language, too, compels the conclusion that a wrongful death action may be premised upon a bullying-induced suicide when it can be shown that the offensive conduct caused the death.

We, therefore, are constrained to conclude that when the anxiety or torment of bullying is shown to have been a substantial factor in causing death by suicide, the resulting suicide is not a superseding intervening event which bars a victim's estate from prosecuting a wrongful death claim. As always, the burden rests upon the plaintiff, the estate of a decedent who committed suicide, to prove all of the elements of the tort. CR 43.01 ("(1) The party holding the affirmative of an issue must produce the evidence to prove it. (2) The burden of proof in the whole action lies on the party who would be defeated if no evidence were given on either side.").

Our recognition of an estate's right to seek recompense for the bullying of its decedent is likewise consistent with, and a natural extension of, our adoption in *Craft v. Rice,* 671 S.W.2d 247 (Ky. 1984), of *Restatement (Second) of*

28

*Torts* § 46 (Outrageous Conduct Causing Severe Emotional Distress), which provides that: "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." As noted in that case: "There is a right to be free of emotional distress arising from conduct by another." *Id.* at 251. We see no rational basis for holding that a person who engages in bullying behavior (or knowingly tolerates it despite an affirmative duty to prevent it, stop it, and report it) will be liable for damages if he drives the victim only to the brink of suicide, but will escape liability if the torment results in suicide.

*Craft* sets forth several limiting factors which are appropriately extended to wrongful death cases premised upon a suicide caused by bullying:

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

671 S.W.2d at 249.[18]

---

[18] It should be obvious that most cases premised upon bullying will involve a wrongful death case with intentional infliction of emotional distress being the underlying tort. Here, negligence is the underlying tort, and a wrongful death suicide case based upon negligence would be less common, but nevertheless would still fall within our holding so as to capture, *inter alia*, this very situation: a situation when teachers negligently fail to stop bullying. In such negligence cases element one of the

·In light of the above discussion, we now return to the specifics of this case as reflected in the record to examine whether there is a genuine issue of material fact concerning but-for causation, and further, whether in this case-specific situation, the Estate's claim can survive proximate cause scrutiny. Of course, within our examination we consider that the Teachers did not perpetrate the actual bullying of Stephen; rather, they were his *in loco parentis* guardians with a ministerial duty to identify and stop the bullying being perpetrated against him.

For purposes of this review, we must accept as true the detailed allegations as contained in the student affidavits that Stephen was deliberately bullied on a regular basis and that the Teachers knew (or should have known) about it, did nothing to stop it, and failed to report it. While we accept as true that bullying can lead to suicide, under the circumstances of this case there is no obvious evidentiary link between the bullying and Stephen's suicide. Stephen apparently never complained about being bullied and he left no note

---

*Craft* elements would apply to the underlying bullying, but element one would be modified as to the negligent actor so as to apply the negligence standards as discussed herein.

We further note that our holding today is consistent with our recent holding in *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012), which permits recovery for negligently inflicted emotional distress in the absence of a physical impact. This rule, in turn, is consistent with *Restatement (Second) of Torts* § 455 (1965) which provides that "If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason." Bullying to a degree driving one to suicide is, in essence, the bringing about of a delirium in the victim and a consequent impulse to self-harm which the victim is unable to resist.

or social media trail to that effect. And as Appellees noted, Stephen had a history of migraine headaches; they suggest that this was likely the reason for his suicide.

The Estate places significant weight upon an email exchange between Stephen's mother, Sheila Patton, and a teacher, Appellee Lynn Handshoe, shortly before Stephen's death. Sheila explained in the email that she was concerned about why Stephen did not want to go to school. She cited a number of concerns which might be symptomatic of bullying, such as poor grades, but she did not express concern about bullying and she did not suggest that Stephen was so distressed that suicide was a concern. The email also suggests explanations other than bullying for Stephen's distress.

The Estate also provided evidence from two expert witnesses retained for this litigation, Barbara Coloroso and psychologist Dr. Susan Lipkins. Neither expert opined with any degree of certainty that Stephen's suicide was caused by bullying. At the time of their respective depositions, neither of the experts had conducted any interviews or investigations into the matter, but rather had relied exclusively upon statements and information provided by the Estate's attorneys. Ms. Coloroso and Dr. Lipkins provided no evidence that serves to establish bullying as the cause of Stephen's death by suicide.

Under the *Steelvest* standard, we are left with evidence, albeit disputed evidence, that Stephen was subjected to persistent bullying by other students at school; that the Teachers knew about it and violated their ministerial duty to stop it, or were negligent in failing to detect it; and that Stephen committed

31

suicide. Without more to establish a link between bullying and Stephen's death, there is nothing to advance the case from mere speculation and supposition to a reasonable inference. It may seem to some that bullying must have been a factor, but we are unable to identify any non-speculative evidence to sustain that position. As we stated in *Blackstone Mining Company v. Travelers Insurance Company*, 351 S.W.3d 193, 201 (Ky. 2010):[19]

> Designed to be narrow and exacting so as to preserve one's right to trial by jury, summary judgment is nevertheless appropriate in cases where the nonmoving party relies on little more than 'speculation and supposition' to support his claims. *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006). The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment.' *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 199 (Ky. 2001).

Based upon our review of the trial record, we are persuaded that there is insufficient evidence to create a genuine issue of material fact about whether Stephen's suicide was caused by bullying. Accordingly, while we reject the conclusions of the Court of Appeals and circuit court that bar liability on the grounds that Stephen's suicide was a superseding intervening cause, we nevertheless affirm the judgment that the Teachers are entitled to summary judgment. We do so upon our conclusion that summary judgment is proper when the plaintiff is unable to assemble sufficient evidence to demonstrate that a reasonable jury could, without resorting to speculation, return a verdict finding the suicide was caused by the bullying.

---

[19] As modified on denial of rehearing (Nov. 23, 2011).

## IV. PAUL D. COVERDALE TEACHER PROTECTION ACT

Appellees also contend that they were entitled to summary judgment under the Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. §§ 6731 *et seq.* The Paul D. Coverdell Teacher Protection Act, a component of the "No Child Left Behind" education bill, "allows school officials to use reasonable measures 'to maintain order, discipline, and an appropriate educational environment.'" *Dennis v. Board of Education of Talbot County*, 21 F. Supp. 3d 497, 502 (D. Md. 2014) (citing 20 U.S.C. § 6732). "[N]o teacher, administrator, or individual member of a school board is liable for harm to a student if he was acting within his scope of employment, and the actions complied with the law and were in an effort to discipline a student or maintain control." *Id.* (citing 20 U.S.C. §§ 6733(6)(A), 6733(6)(D), 6736(a)(1) – (2)). Having disposed of this case on other grounds, we need not plumb the depths of the Act to determine its applicability to the unusual and tragic circumstances of this case.

## V. CONCLUSION

We have consistently held that a teacher's duty to supervise students is ministerial in nature and that the consequences for a breach of that duty may not be dismissed under the cover of qualified immunity. We reiterate that holding in this case. The Estate's evidence presented a genuine issue of material fact concerning whether the Appellee Teachers complied with that duty. The Appellee Administrators, however, were entitled to qualified official immunity because their duty was discretionary, a conclusion that is also consistent with our precedent.

33

We further conclude that suicide as a result of bullying is not a superseding intervening event that bars the imposition of liability for the bullying behavior. However, summary judgment dismissing the complaint was proper because the evidence did not sufficiently establish bullying as a cause of the suicide so as to create a genuine issue of material fact as to causation. Therefore, we affirm the decision of the Court of Appeals although we do so on different grounds.

Minton, C.J.; Hughes, Keller, Venters, and Wright, JJ., concur. Cunningham concurs in result only by separate opinion. VanMeter, J., not sitting.

CUNNINGHAM, J., CONCURRING IN RESULT: I concur in result with the Majority's opinion. However, with profound respect and appreciation for the excellent research and writing of Justice Venters, there are some unsettling things about the Majority opinion with which I cannot accept. I fear that we are slowly shifting our mounting societal ills onto the shoulders of our underpaid teachers who are already burdened with trying to teach our young, while at the same time dealing with students who have been emotionally and psychologically damaged from causes outside the classroom.

First, I cannot conclude that the Allen Central Middle School Bullying Policy (the "Policy"), and similar anti-bullying policies throughout our school districts, are ministerial in nature. The duty to report bullying may be ministerial, but determining the existence of the proscribed behavior is a discretionary task. Upchurch v. Clinton County, which was decided in 1959, dealt with a statutory

directive for the County to hire a dog warden. 330 S.W.2d 428 (Ky. 1959).

Simple enough to follow. In our Marson v. Thomason, decision cited by

Majority, it was a simple chore of making sure the bleachers were pulled out.

438 S.W.2d 292 (Ky. 2014). These ministerial acts are almost mechanical

compared to the arduous task of a teacher judging student behavior to

determine if he or she is being bullied.

The Policy at issue went well beyond listing specific behavior which constituted

bullying and instead provided an overly broad definition. Further inspection of

the Policy language reveals that the bullying definition is so broad that it

requires teachers to make fact-intensive decisions, and should cloak them in

qualified immunity. Indeed, the Policy defines bullying as any form of

communication that teases, mocks, or is "rude/negative/hurtful/off color . . . ."

Our interpretation of this Policy confers upon the teachers a duty to report

even the most minuscule infraction, or worst yet, a suspected infraction.

In our opinion here today, we afford the administrators a safe haven of

qualified immunity. In not extending the same protection to the teachers, we

are encouraging an unworkable school environment. Desk generals may draw

up exact and precise instructions for the foot soldiers, which in the class rooms

and hallway prove impractical. Such directives so easily drawn, protect the

administrators from lawsuits. But they are unworkable, unless teachers use

common sense and discretion in their implementation. Through this process,

teachers are thrown under the bus, unless they follow these instructions in

such an exacting way that will prove catastrophic to the smooth and orderly working of a school day.

If every teacher cited to the principal's office every high school student who hit someone in the hallway, no matter how jokingly; grabbed someone in the hallway; pinched someone in the hallway; twisted arms in the hallway; pushed or shoved someone in the hallway; flipped, threw or tossed paper wads at another student in the hallway; poked or punched someone in the hallway; or hid the Mad magazine of another student; there would not be a high school football team in Kentucky that wasn't on probation.

Teenage youngsters are not robots, moving about the classrooms, hallways, school yards or gym in drill-like precision. They are full of vim, vigor and bursting with energy screaming to be released from an hour of confinement in a geometry classroom.

Kids can either be cruel, or jokingly engaging in good natured ribbing with a good friend. Sometimes there is a thin line between the two. Discretion is required.

Bullying is defined by the U.S. Department of Health and Human Services as the "repeated" and "unwanted, aggressive behavior among school aged children that involves a real or perceived power imbalance." U.S. Dep't of Health & Human Servs., What Is Bullying: Bullying Definition, stopbullying.gov, http://www.stopbullying.gov/what-is-bullying/definition/index.html (last visited Nov. 23, 2016). I would submit that under this broad based definition, much discretion is mandated. The definition in this case attempts to be more

specific, but in doing so encompasses conduct which almost every young student will exhibit in some form during the course of any school day.

If we impose a ministerial duty on teachers in this respect they will have no time to teach; rather they will be obsessed with the fear of lawsuits hovering over their every act and every decision.

In the real world, teachers likely only report the serious infractions, such as verbal or physical intimidation and abuse. Since any bullying policy will inherently recognize a hierarchy of bullying behavior, it requires the teachers to "exercise [] discretion and judgment, or personal deliberation" whether or not such behavior is severe enough to report. Yanero v. Davis, 65 S.W.3d 510, 522 (2001). In doing so, the teachers are left with "a legally uncertain environment." Id. We must keep in mind that insuring student safety is "situation specific, and . . . requires judgment rather than a fixed, routine performance." Marson, 438 S.W.3d at 299.

The examination of the discretionary or ministerial functions of these types of policies is "inherently fact-sensitive." Haney v. Monsky, 311 S.W.3d 235, 246 (Ky. 2010). In the case before us, the Policy not only included the catch all "rude/negative/hurtful/off color" comments, but also specified that "hitting, grabbing . . . pushing . . . [and] hiding or damaging another student's property" is bullying.

There are other conclusions in the Majority, which give me pause.

I am troubled with concluding that administrators supervise teachers and not students. Unless things have changed drastically since the dark ages when

37

this writer was in school, the principal still gazes out with intense supervision over every school assembly, proms, and athletic contests. That's not to mention the preeminence of the school warden patrolling the hallways on a regular basis.

Furthermore, we should go ahead and provide our teachers the protection which our U.S. Congress intended them to have with the enactment of the Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. §§ 6731 et seq. The part germane to this case reads "[N]o teacher, administrator, or individual member of a school board is liable for harm to a student if he was acting within his scope of employment, and the actions complied with the law and were in an effort to discipline a student or maintain control." Id. (citing 20 U.S.C. §§ 6733(6)(A), 6733(6)(D), 6736(a)(1) – (2)).

Lastly, there is the searing and most tragic of all tragedies—teenage suicide. It is both a heart breaking and unfathomable occurrence that baffles our communities and homes with soul numbing despair. As our hearts break, we strive to understand this tragedy of all tragedies. But alas, we stand mute and witless to any answer. In spite of the excellent analysis written by the Majority in this case, I am not ready to say that in cases such as this, it is not, as the trial judge found, a superseding intervening cause interrupting any potential liability of the administrators and teachers alike.

For these reasons, I respectfully concur in result only with the Majority opinion.

COUNSEL FOR APPELLANT:

Vanessa B. Cantley
Bahe, Cook, Cantley & Nefzger, PLC

COUNSEL FOR APPELLEES DAVIDA BICKFORD, PAUL FANNING AND
RONALD "SONNY" FENTRESS:

Michael J. Schmitt
Jonathan C. Shaw
Porter, Banks, Baldwin, & Shaw


COUNSEL FOR APPELLEES JEREMY HALL, ANGELA MULLINS, LYNN
HANDSHOE AND GREG NICHOLS:

Neal Smith
Todd P. Kennedy
Smith Thompson & Kennedy, PLLC.

# Supreme Court of Kentucky

## 2013-SC-000560-DG

FLOYD LAWRENCE PATTON, AS
ADMINISTRATOR OF THE ESTATE OF
STEPHEN LAWRENCE PATTON

APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2012-CA-000598
FLOYD CIRCUIT COURT NO. 08-CI-00653

DAVIDA BICKFORD, PAUL FANNING,
RONALD "SONNY" FENTRESS, JEREMY
HALL, ANGELA MULLINS, LYNN
HANDSHOE, AND GREG NICHOLS

APPELLEES

## ORDER DENYING PETITION FOR REHEARING AND GRANTING MODIFICATION OF OPINION

The Petition for Rehearing filed by the Appellant, Floyd Lawrence Patton,

as Administrator of the Estate of Stephen Lawrence Patton, rendered March 17,

2016, is DENIED, and the Opinion of this Court is modified by substitution of

the attached Opinion in lieu of the original Opinion of the Court. Said

modification does not affect the holding of the original Opinion of the Court.

Minton, C.J.; Hughes, Keller, Venters, and Wright, JJ., concur.
Cunningham concurs in result only by separate opinion. VanMeter, J., not
sitting.

ENTERED: August 24, 2017.

_____
CHIEF JUSTICE

2