RENDERED:  MAY 5, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0021-MR

MICHAEL A. VENEMAN, CPA PSC
AND E-PAY, INC.                                                          APPELLANTS


                    APPEAL FROM CAMPBELL CIRCUIT COURT
v.               HONORABLE JULIE REINHARDT WARD, JUDGE
                         ACTION NO. 20-CI-00274


TRAVELERS CASUALTY
INSURANCE COMPANY OF
AMERICA                                                                    APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, LAMBERT, AND TAYLOR, JUDGES.

LAMBERT, JUDGE:  This appeal arises from a summary judgment in favor of

Travelers Casualty Insurance Company of America (Travelers) regarding the

interpretation of a contract of insurance and endorsements for forgery and

alteration and for computer fraud.  We affirm.

Michael A. Veneman, CPA PSC, is a professional service corporation that was organized under Kentucky law and licensed to provide accounting and payroll services, tax preparation, and advice to clients in Kentucky. E-Pay, Inc., was a Kentucky for-profit corporation that was in the business of making electronic payroll deposits and disbursements. (Collectively, the plaintiffs or the appellants.) Travelers is an insurance company organized in Connecticut. The plaintiffs purchased a contract of insurance from Travelers on August 6, 2015 (policy no. 680-2G554600), and this policy has been periodically renewed. The policy included extensions that included protections against forgery or alteration and computer fraud.

The events giving rise to the underlying lawsuit occurred on March 27, 2018, when the plaintiffs entered into a contract with a person they believed to be Tim Spencer to process payroll deposits for TK Management, Inc. On March 30, 2018, a person claiming to be Tim Spencer (or his agent) withdrew a large deposit from the payroll account and sent the funds out of the country via Western Union. In a motion filed in the underlying lawsuit, Travelers described the chain of events as follows:

> The Plaintiffs are related entities that process payroll for small businesses. Unfortunately, one purported client they had signed up turned out to be an imposter posing as a legitimate business owner. Using a sophisticated scheme, the imposter furnished personal bank account information and directed the Plaintiffs to

-2-

transfer money from it to other bank accounts purportedly belonging to the imposter's employees. However, as it was later discovered, the other accounts actually belonged to the imposter or persons working with him.

Plaintiffs hired Cachet Financial Services (a clearinghouse bank) to make the transfers. Once the transfers had taken place, the imposter withdrew large sums of money. In an ironic twist, the imposter also contacted Bank of America to report the out-going transfers as fraudulent. Under complicated clearinghouse rules for banks, this report of fraud triggered a "claw back" of various transactions such that Cachet bore the risk of loss, which it then shifted back to the Plaintiffs by contract. The end result was a high-tech theft that allowed the imposter to escape detection and wire funds out of the country.

In a footnote, Travelers stated:

After the fraud had come to light, Cachet demanded reimbursement from Plaintiff E-Pay, Inc. which then signed a promissory note in favor of Cachet to cover the loss. However, in February 2019, E-Pay filed for bankruptcy and the obligation to repay Cachet was discharged as part of that proceeding. *In re E-Pay Inc*., Case No. 19-20143-tnw, E.D. Ky. 2019. Both Cachet and [E-Pay] are now defunct.

More specifically, Travelers stated the material, undisputed facts as follows (with references removed):

In March 2018, an unknown individual posing as "Timothy Spencer" contacted Plaintiffs and claimed to own a company named TK Management Incorporated (hereinafter "TK") located in Jackson, Kentucky. After exchanging phone calls and emails with the imposter, the Plaintiffs decided to provide payroll services for TK.

-3-

During this process, the imposter signed a payroll service agreement, a bank account authorization agreement and other documents. The imposter also gave Plaintiffs a blank check for TK's checking account with Bank of America.

Consistent with the written agreements, Plaintiffs began processing payroll for the imposter. Plaintiff E-Pay Inc. received instructions and information via email from the imposter necessary to make the transfers (i.e., the names of the employees, the amounts each employee should receive, the names of the receiving banks, the employees' checking account numbers, and so forth). Plaintiff Michael Veneman CPA PSC took the information received by E-Pay Inc., put it into a formal report for tax withholding purposes and the report would then be sent to Cachet to effectuate the transfers. In other words, Plaintiffs provided payroll instructions to Cachet, which then withdrew funds from the imposter's checking account and routed those funds to the imposter's "fictitious" employee accounts.[1]

After Cachet had transferred a series of funds, the imposter contacted Bank of America to report fraud. During this process, the imposter withdrew funds from the fictitious employee accounts and wired them out of the country. [Footnote omitted.] Once the fraud came to light, Plaintiffs were able to recoup some of the funds and give them to Cachet and the IRS.

The plaintiffs made a claim with Travelers (claim no. DHR4194) on their policy, and the claim was denied on January 16, 2020. As a result of the

---

[1] When Cachet initiated the first few transfers from the imposter's account, the transactions failed. The imposter then provided Plaintiffs with alternate routing numbers for his Bank of America account, and the transactions were then successful. Despite the fact that the first few transfers "bounced," the Plaintiffs chose to continue processing payroll for the purported client. This turned out to be a poor business decision. (Footnote 2 in original.)

denial, the plaintiffs filed a complaint against Travelers on March 18, 2020, with the Campbell Circuit Court. They alleged that coverage existed under both the forgery or alteration and computer fraud provisions of the policy endorsements (Counts 1 and 2) and that Travelers had breached its contract with them by failing to cover their loss (Count 3), which entitled them to $35,000.00. They also alleged claims for breach of an implied contract (Count 4), detrimental reliance (Count 5), fraud and/or misrepresentation (asserting that a reasonable person would believe that the policy covered forgery or alteration and computer fraud) (Count 6), and bad faith (Count 7). The plaintiffs sought both compensatory and punitive damages.

Travelers filed a notice of removal to the United States District Court for the Eastern District of Kentucky at Covington on April 14, 2020, based on diversity jurisdiction, and filed an answer in that court. By stipulation and agreed order, the case was remanded to the Campbell Circuit Court on June 2, 2020. The stipulation provided that the combined total damages the plaintiffs sought from Travelers would be capped at $74,999.99, meaning that the federal district court lacked diversity jurisdiction.

Upon remand, Travelers moved the circuit court, pursuant to Kentucky Rules of Civil Procedure (CR) 26.03 and 42.02, to stay discovery on and bifurcate the plaintiffs' non-contractual claims until the contractual claims were

-5-

resolved, either by judgment or settlement. The court granted this motion by order entered March 8, 2021, and bifurcated all bad faith claims. Michael Veneman was deposed, and through his testimony and discovery responses, supporting documents were introduced.

On September 6, 2021, Travelers filed a motion for summary judgment, arguing four grounds to support the motion. First, it argued that there were not any direct physical losses to any covered property as defined by the policy based upon the transfer of funds. Second, there were no forgeries or alterations of any checks, drafts, promissory notes, or other similar written promises, orders, or directions that were made. Third, there was no computer fraud as the loss did not arise from a hacking event or other direct use of a computer. And fourth, even if the terms of the policy could be met, the voluntary parting exclusion precluded coverage. Because it had not breached the terms of the insurance policy, Travelers asserted that the plaintiffs' remaining claims should be dismissed as a matter of law. In response, the plaintiffs argued that the undisputed facts supported that both endorsements applied in this case.

On September 17, 2021, the plaintiffs filed their own motion for summary judgment, arguing that coverage applied. They stated that they had been scammed by an imposter who had emailed them "fraudulent documents, emailed an altered personal check made to look like a business check, emailed directions

(orders to pay), and included electronic transfers from a clearinghouse bank (Cachet Banq) to the accounts of fictitious employees which were controlled by the imposter," which then led to the transfer of funds out of the country by Western Union. The amount of the lost funds totaled $229,657.59, which Cachet attempted to recover from E-Pay, Inc., and in doing so illegally seized funds from another of the Plaintiffs' clients, Art's Rent-a-Tool. Although the seized funds were returned, Michael Veneman CPA PSC had lost that company as a client, held since 2018. The plaintiffs were able to recoup a small amount, but they lost a deposit for taxes to the IRS. As their argument, the plaintiffs contended that both endorsements applied to provide coverage in this case. In its response, Travelers argued that the information about Art's Rent-a-Tool was not pertinent to the coverage analysis as the complaint only referenced the fraudulent activity of the imposter.

The court heard oral arguments from the parties on November 22, 2021. The court asked plaintiffs' counsel about the voluntary parting exclusion, which had not been addressed in their brief. He argued that the two endorsements should be read separately from the policy, which would remove the voluntary parting exclusion, but he did not cite any caselaw to support this position or respond to the caselaw cited by Travelers. As far as damages, the plaintiffs were claiming $45,000.00 due to the loss of a client. The other companies (Cachet and E-Pay) were defunct and would therefore not be making any claims for payment

-7-

for the funds that were lost to the imposter. Travelers argued that the policy declarations and endorsements were to be construed as a whole and that the endorsements were not stand-alone policies.

On December 2, 2021, the circuit court entered an order ruling on the cross-motions for summary judgment. The Court found no merit in any of the plaintiffs' claims and denied their motion, and it granted Travelers' motion, finding that it was entitled to a judgment as a matter of law on all of the plaintiffs' claims. This appeal now follows.

On appeal, the plaintiffs (now appellants) argue that the circuit court improperly granted summary judgment to Travelers on their claims related to the application of the forgery or alteration and computer fraud endorsements and for breach of contract. They have not raised any issues as to the remaining claims of breach of implied contract, detrimental reliance, fraud and/or misrepresentation, and bad faith. Therefore, we shall not address the circuit court's ruling as to those claims.

An appellate court's standard of review of a summary judgment is set forth in *Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016):

> Summary judgment is a remedy to be used sparingly, *i.e.* "when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013)

-8-

(citations omitted). We frequently caution, however, the term "impossible" is to be used in a practical sense, not in an absolute sense. *See id.* (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992)). The trial court's primary directive in this context is to determine whether a genuine issue of material fact exists; if so, summary judgment is improper, *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). This requires that the facts be viewed through a lens most favorable to the party opposing summary judgment, here the Estate. *Id.* It is important to point out that "a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482.

A motion for summary judgment presents only questions of law and "a determination of whether a disputed material issue of fact exists." *Shelton*, 413 S.W.3d at 905. Our review is de novo, and we afford no deference to the trial court's decision.

As there are no disputed material facts, our review is whether the circuit court, as a matter of law, properly interpreted the policy of insurance and granted summary judgment to Travelers.

In *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Insurance Company*, 814 S.W.2d 273, 279 (Ky. 1991), the Supreme Court of Kentucky addressed the interpretation of insurance contracts and recognized:

The proper standard for the analysis of insurance contracts in Kentucky is a subjective one. *Fryman v. Pilot Life Insurance Company*, Ky., 704 S.W.2d 205 (1986) holds that terms of insurance contracts have no technical meaning in law and are to be interpreted according to the usage of the average man and as they

would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured.

And in *Motorists Mutual Insurance Company v. RSJ, Inc.*, 926 S.W.2d 679, 681 (Ky. App. 1996), this Court recognized that "terms used in insurance contracts 'should be given their ordinary meaning as persons with the ordinary and usual understanding would construe them.' *City of Louisville v. McDonald*, Ky. App., 819 S.W.2d 319, 320 (1991)." With these statements of the law in mind, we shall consider the appellants' arguments.

Our review of the circuit court's order confirms that its legal analysis was correct, and we shall adopt the following reasoning as our holding in this case:

> First, Plaintiffs argue that they are covered by the policy extensions for "Forgery or Alteration" and Computer Fraud." [Plaintiffs maintain] that these policy extensions stand or fall on their own and must be construed separately from the remainder of the Policy. This position is not supported by Kentucky case law or the language of the Policy itself.
>
> . . . .
>
> The Kentucky Supreme Court has determined that "[t]he policy and its endorsement validly made a part thereof together form the contract of insurance, and are to be read together to determine the contract actually intended by the parties." *Kemper Nat. Ins. Companies v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 875 (Ky. 2002) (citing 1 *Couch on Insurance* 2d § 4:36 (1983)). The plain language of the Policy states: "This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that

-10-

declarations form." The Court believes that the Policy must be construed as a whole, and that the "computer fraud" and "forgery or alteration" coverage extensions are not standalone provisions.

Next the Plaintiffs contend that the electronic funds transferred by Cachet to the imposter's fictitious employees were "covered property" under the Policy. Under the Businessowners Property Coverage Special Form MP T1 02 02 05, the policy provides, in relevant part:

**A. COVERAGE**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Form, means the type of property described in this Paragraph A.1., and limited in Paragraph A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

. . . .

**b. Business Personal Property**
located in or on the buildings described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, including:

(1) Property owned by you and used in your business;

-11-

(2) Property of others
that is in your care,
custody or control;

(3) Your use interest as a
tenant in improvements
and betterments . . . and

(4) "Money" and
"Securities."

**2. Property Not Covered**

Unless the following is added by
endorsement to this Coverage Form,
Covered Property does not include:

. . .

(k) Accounts and bills, except
as provided in the Accounts
Receivable Coverage
Extension[.]

. . .

**4. Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS
unless the loss is:

(a) Limited in Paragraph A.5.,
Limitations; or

(b) Excluded in Paragraph B.,
Exclusions.

. . .

## G. PROPERTY DEFINITIONS

. . .

**17. "Money"** means currency and coins in current use, bank notes, travelers checks, registered checks and money orders held for sale to the public.

. . .

**25. "Securities"** means all negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes revenue or other stamps in current use, tokens, tickets and credit card slips for sales made by you and held by you for reimbursement from companies issuing credit cards, bud does not include "money". Lottery tickets held for sale are not securities.

In the present case, "business personal property" is defined as property located in or on the premises described in the Declarations or located in the open or within 1,000 feet of the described premises. "Business personal property" also includes property owned by the insured and used in its business; "money" and "securities"; and property of others in the insured's care, custody, and control. The electronic funds at issue were not located on the Plaintiffs' building premises, nor were they located in the open or within 1,000 feet of the premises. Moreover, the funds were not "money" or "securities" under the Policy.

In *Harvard Street Neighborhood Health Center, Inc. v. Hartford Fire Ins. Co.*, CV 14-13649-JCB, 2015 WL 13234578, at *8 (D. Mass. Sept. 22, 2015), the court held that funds deposited into a bank account do not have a physical material existence and are not susceptible to

-13-

physical loss or damage. Similarly, in *Florists' Mutual Insurance Co. v. Ludy Greenhouse Mfg. Corp.*, 521 F. Supp. 2d 661, 680-81 (S.D. Ohio 2007), the court determined that funds deposited into a bank account were intangible property and intangible personal property is not capable of being physically possessed. Thus, to qualify as "money" or "securities," the property must involve physical funds or tangible negotiable instruments. Since the electronic funds at issue did not have a physical existence, they do not meet the definition of "money" or "securities" under the Policy.

Thus, the only way the electronic funds could qualify as "business personal property" is if the funds were in the Plaintiffs' "care, custody, or control." In *Loeb Properties, Inc. v. Federal Ins. Co.*, 663 F. Supp. 2d 640, 647 (W.D. Tenn. 2009), the Court determined that care, custody, and control in the insurance context denotes exclusive dominion over property (citing 9 *Couch on Ins.* § 126:22 (3d ed. 1997)). Specifically, the Court found that the plaintiff did not have exclusive dominion over the Loebs' personal bank account when the money in the Loebs' account was in the bank and the funds were never stored at Plaintiff's premises. Plaintiff did not own the funds and lacked authority to direct how the Loebs spent those funds. *Id*. at 647-48.

Even if the electronic funds could be considered "personal property," there was no "direct physical loss" to "covered property." "Direct physical loss" is not defined in the Policy. However, courts have interpreted "direct physical loss" to require tangible property and have determined that electronic funds do not have a physical existence and thus, are not susceptible to physical loss or damage. *See Florists' Mut. Ins. Co. v. Ludy Greenhouse Mfg. Corp.*, *supra*; *Sentience Studio, LLC v. Travelers Ins. Co.*, 102 F. App'x 77, 81 (9th Cir. 2004).

-14-

In the present case, the funds in the imposter's bank account were not susceptible to physical loss because the funds were intangible and incapable of being physically possessed. Since the loss did not involve damage to physical coins or currency, the Plaintiffs cannot show that there was a "direct physical loss" to "covered property."

The Court also believes that the facts fail to trigger coverage under the terms of the Policy's "Forgery or Alteration" extension. The policy extension states:

### i. Forgery or Alteration

(1) We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by or drawn upon you, or made or drawn by one acting as an agent or purported to have been so made or drawn.

We will consider signatures that are produced or reproduced electronically, mechanically or by facsimile the same as handwritten signatures.

. . .

### G. PROPERTY DEFINITIONS

. . .

-15-

12. "Forgery" means the signing of the name of another person or organization with the intent to deceive. "Forgery" does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose."

Plaintiffs contend that the emails sent by the imposter directing Plaintiffs to initiate the transfers of electronic funds constituted "checks, drafts, promissory notes, or similar written promises, orders, or directions to pay." However, courts have held that emails do not have the same legal effect as checks, drafts, or promissory notes, and that the promises, orders or directions to pay must resemble a check, draft, or promissory note. *Midlothian Enterprises, Inc. v. Owners Insurance Company*, 439 F. Supp. 3d 737, 743 (E.D. Va. 2020); *Sanderina, LLC v. Great American Insurance Company*, 218CV00772JADDJA, 2019 WL 4307854, at *3 (D. Nev. Sept. 11, 2019). Thus, the Court does not believe that the emails constituted "checks, drafts, promissory notes, or similar written promises, orders, or directions to pay."

Plaintiffs further maintain that the "Forgery or Alteration" extension was triggered because the imposter presented a blank check for an account belonging to TK Management Inc. However, the Policy requires the forgery or alteration of a check that was "drawn by or drawn upon" the insured. Since the check was not drawn on an account belonging to Michael A. Veneman CPA PSC or E-Pay Inc., the loss does not involve the forgery of a check, draft or other negotiable instrument drawn by or drawn upon the Plaintiffs. Accordingly, the "Forgery or Alteration" extension does not apply.

-16-

Plaintiffs also argue that the emails sent by the imposter trigger the Policy's "Computer Fraud" coverage. The coverage provides:

**b. Computer Fraud**

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss of or damage to Business Personal Property resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the building at the described premises or "banking premises":

(a) To a person outside those premises; or

(b) To a place outside those premises.

The Defendant contends that although the imposter used a computer to send emails to Plaintiffs directing the transfers, the "Computer Fraud" coverage does not apply because the transfers did not result directly from the use of a computer. When considering this issue, courts have examined the connection between the imposter's use of a computer and the transfer of the funds. In *Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 656 F. App'x 332, 333 (9th Cir. 2016), the Court noted that the mere fact that a transfer involves a computer and fraud at some point in the transaction is not enough to trigger coverage under a computer fraud policy. Specifically, the Court observed that "[b]ecause computers are used in almost every business transaction, reading this provision to cover all transfers that involve both a computer and fraud at some point in the transaction would convert this Crime Policy into a 'General Fraud' Policy." Similarly, in *Apache Corp. v. Great Am. Ins. Co.*, 662 F. App'x 252, 258 (5th Cir. 2016), the Court determined that coverage under a computer fraud policy did not apply

-17-

merely because the imposter's email was part of the scheme. Rather, the email was merely incidental to the transfer of funds.

The present case does not involve a hacker gaining access to the Plaintiffs' computer system to fraudulently cause a transfer of funds. Rather, the imposter used a computer to send emails to Plaintiffs directing them to process payroll, and then Plaintiffs sent the information to third party clearinghouse, Cachet, who actually transferred the funds from the imposter's bank account with Bank of America to the imposter's fictitious employees. Although the emails that Plaintiffs relied on were fraudulent because they were from an imposter posing as Timothy Spencer, the loss itself did not directly result from the use of a computer. There was no direct connection between the imposter's use of a computer to send emails to Plaintiffs and Cachet's actual transfer of the funds. Therefore, the "Computer Fraud" coverage does not apply.

Finally, even if the terms of the Policy were otherwise met, the "Voluntary Parting" exclusion precludes coverage. The Policy states: "we will not pay for loss or damage caused by or resulting from . . . voluntary parting with any property by you or anyone else to whom you have entrusted the property." Voluntary parting exclusions have been upheld in the former Kentucky Court of Appeals. In *Ins. Co. of N. Am. v. Lile*, 321 S.W.2d 50, 51 (Ky. 1959), when an auto dealer delivered temporary custody and possession of a car to a man based on his false representation that he was employed by another individual known to the auto dealer and then took the car without paying and did not return, the Court held that the loss was excluded from coverage because the dealer voluntarily parted with the vehicle. In explaining its decision, the Court stated:

> [T]he insurer plainly manifests therein an
> intention not to enter into a contract equal to

-18-

a 'blanket bond guaranteeing the integrity of all persons' to whom the insured might voluntarily entrust the possession of the insured property, and that the loss incurred by such delivery should be borne by the insured who possesses superior opportunities for ascertaining the moral character and reputation of the one to whom possession is so given than does the insurer and that the consequences should fall' on him.

*Id.* (citing *Aetna Casualty & Surety Co. v. Salyers*, 172 S.W.2d 635 (Ky. 1943), and *Kidwell v. Paul Revere Fire Ins. Co.*, 172 S.W.2d 639 (Ky. 1943)).

Here, after receiving email instructions from the imposter, the Plaintiffs directed Cachet to transfer funds from the imposter's bank account to the accounts of the imposter's fictitious employees. After the first few transfers did not go through successfully, the Plaintiffs continued to work with the imposter, prompting the imposter to provide new banking numbers. Although the Plaintiffs later learned that the emails came from an imposter in an effort to initiate fraudulent transfers, this does not change the voluntariness of the parting. Moreover, because the funds were not owned by Plaintiffs and the actual transfer of funds was done by Cachet and not Plaintiffs, the Court does not believe that the Plaintiffs actually possessed covered property under the Policy to part with. However, even if the Court determined that the Plaintiffs possessed covered property, the parting was done voluntarily. Thus, the "Voluntary Parting" exclusion precludes coverage.

Accordingly, because there was no coverage under the policy, there could be no breach of contract, and the appellants' claims must fail as a matter of

law. The circuit court did not commit any error in granting summary judgment in favor of Travelers and denying the appellants' cross-motion.

For the foregoing reasons, the summary judgment in favor of Travelers is affirmed.

ALL CONCUR.


BRIEF FOR APPELLANTS:                    BRIEF FOR APPELLEE:

Richard A. Jarvis                        Stephen C. Keller
John C. Hayden                           Adrianna M. Long
Newport, Kentucky                        Louisville, Kentucky