RENDERED:  MARCH 1, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1311-MR

ALEXANDER G. CARPENTER                                    APPELLANT

v.                  APPEAL FROM JEFFERSON CIRCUIT COURT
                          HONORABLE MITCHELL PERRY, JUDGE
                          ACTION NO. 20-CI-000510

BARRY GOODALL AND
JEFFERSON COUNTY BOARD OF
EDUCATION                                                      APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, CETRULO, AND GOODWINE, JUDGES.

ACREE, JUDGE:  Appellant, Alexander Carpenter, appeals the Jefferson Circuit

Court's October 5, 2021 order granting summary judgment in favor of Appellees,

Barry Goodall and the Jefferson County Board of Education.  We affirm.

In 2019, Appellant attended Eastern High School in Louisville as an

eleventh-grade high school student.  At all relevant times, he was a minor who

suffered from attention deficit hyperactivity disorder (ADHD) and post-traumatic

stress disorder (PTSD), both of which physically manifested as panic attacks. The school accommodated these disabilities by implementing an Individual Education Program (IEP) for him. Appellant's IEP allowed him to remove himself from a stressful situation to "cool down" by going to the safe space of the Assistant Principals' offices. His IEP did not permit him to leave the school.

On October 28, 2019, while Appellant sat in his fifth-period civics class, he drank an alcoholic beverage from a water bottle. His behavior suggested to his teacher he was intoxicated. The teacher alerted Shaun Davis, a coach at the school who is also identified in the record as "Security." Davis escorted Appellant from the classroom on the second floor and toward the Assistant Principals' offices on the first floor. When they reached the first floor, they were joined by the school's In-School Security Monitor, Barry Goodall.

Goodall was in his twenty-third year as security at Eastern High School when this incident with Appellant occurred. A few weeks earlier, Goodall broke up a fight involving Appellant and three other students in a school stairwell. All four were throwing punches. (Record (R.) 226-27 (Goodall deposition)).

As they approached their destination, Appellant began experiencing a severe anxiety attack, but he did not alert anyone. There is not total agreement about what happened next. We focus our attention on material facts not in dispute.

According to Appellant's affidavit, he and Coach Davis left the classroom around 12:28 PM. (R. 251 (Appellant's affidavit)). As fifth-period classes let out, Appellant, Goodall, and Davis "arrived in the area next to the Assistant Principals' offices . . . ." (*Id.* at 252). Video surveillance of the incident shows the hallway became crowded with students. (R. 374 (Plaintiff's Response to Motion for Summary Judgment, Exhibit 5)).[1] Rather than entering the offices, Appellant "continued to walk past the Assistant Principals' offices towards the eastern exit into the student parking lot, with the intention of 'cooling down' in [his] car." (R. 252 (Appellant's affidavit)). Appellant said he was intent on "going to sit out in his car until the school day ended, but they [Goodall and Coach Davis] would not let him." (R. 261 (Plaintiff's Answers to Interrogatories)).

The school officials reasonably believed they could not allow Appellant to leave the school while intoxicated, so he was given verbal instruction; "Mr. Goodall told me to 'go this way,' into the Assistant Principals' offices." (R. 252 (Appellant's affidavit)). Appellant did not follow Goodall's verbal instruction and, according to Appellant, "Coach Davis then stepped in front of me and put his right arm out and against my chest and said, 'stop[.]'" (*Id.*). Appellant then "told

---

[1] This Exhibit 5 is a DVD-Rom of the surveillance footage in the hallway covering the time this incident occurred. It is grainy footage, from quite a distance away, and reveals nothing about who initiated any contact. It makes clear, however, that there were many students in the immediate vicinity.

Coach Davis, 'Don't touch me.'" (*Id.*). Appellant "continued to walk, attempting to move past him." (*Id.*).

According to Appellant's complaint, "Goodall forcefully grabbed [Appellant's] arm . . . ." (R. 178 (Verified First Amended Complaint, ¶ 12)). Goodall admitted grabbing Appellant by the arm, saying in deposition, "I gave what's called a bicep assist, which is where I have one hand on the bicep, and one hand above the wrist, and attempted to direct him toward the assistant principal's office door." (R. 230-31 (Goodall deposition)).

Appellant said Goodall then "grabbed me from behind and held both of my arms behind my back . . . ." (R. 252 (Appellant's affidavit)). Goodall admitted this, too, calling the maneuver a "standing upper torso assist." (R. 230 (Goodall deposition)). However, Appellant does not explain what happened between the point in time Goodall was holding his arm in a bicep assist and when Goodall grabbed him from behind. Goodall explained in his deposition what transpired in a way not contradicted by the record.

Goodall testified as follows:

Q      Was the bicep assist one of those safe crisis management physical interventions that you received training in August or September prior?

A      Yes.

Q      Okay. And was that bicep assist . . . effective?

A      No.

Q      Why is that?

A      He broke loose out of it.

Q      Then you were not able to get him into the A[ssistant] P[rincipals'] offices, sir?

A      Correct.  Or should I say, no?

Q      I understand.  I appreciate it.  What happened next sir?

A      From that point I attempted a standing upper torso assist.

(R. 230 (Goodall deposition)).

Appellant said he resisted Goodall's attempted standing upper torso assist; "I struggled to get free from Mr. Goodall and he shoved me into the corner by the cafeteria doors with my back to the wall, and then 'took me down' to the ground, causing the back of my head to hit the concrete wall, and my back to hit the ground, and Mr. Goodall to come down on top of me."  (R. 252-53 (Appellant's affidavit)).  When they hit the floor, "[Appellant's] arms were in front of him." (R. 178 (Verified First Amended Complaint, ¶ 12)).  In that brief time, according to Appellant, Goodall went from being behind him, pinning his arms behind him, to Goodall and Appellant's arms being in front of Appellant. Appellant presented no proof about how that change occurred.  Goodall's testimony again explains it without contradicting Appellant's affidavit testimony:

-5-

A       I attempted an upper torso assist. Standing upper torso assist.

Q       Okay, can you tell me what that is, please?

A       That is where I maneuver behind the person and attempt to wrap my arms around the subject's arms, and where I hold them from behind.

Q       Okay, were you able to effectuate that standing upper torso assist on [Appellant]?

A       For less than five seconds. He broke out.

Q       At the time that you were effectuating the upper torso assist, what was Coach Davis doing?

A       He was still standing there where he was.

Q       Okay. And what happened after he broke free, Mr. Goodall?

A       At that time, Coach Davis attempted to assist me. We both had [Appellant] by each arm, which would be another attempted bicep assist. But at this – at the at that time, Coach Davis had a hold of [Appellant's] other arm. But he immediately broke away from that, also.

        . . . .

Q       . . . Mr. Goodall, what happened when [Appellant] broke free of you and Coach Davis? . . . .

A       He became – he began pushing me at that point. And then he, [Appellant], myself and Coach Davis had lost control of [Appellant]. Like I said, he broke free of the bicep assist, he started pushing me, and we all three were headed in the same direction. And

-6-

as [Appellant] pushed me, I was knocked off balance, went face first into a concrete wall.

(R. 230-31 (Goodall deposition)).

Appellant's affidavit continues to describe how Goodall "called over to Coach Davis to help in a calm voice" and Davis did help by, in Appellant's words, "la[ying] over the lower-half of my body trying to hold me still . . . ." (R. 253 (Appellant's affidavit)). Appellant continuously yelled at the security officers to get off him, "including using curse words" and telling them, "I have PTSD[.]" (*Id.*). Appellant next describes that Davis stood up first, then Goodall, and "Goodall grabbed me and took me into the Assistant Principals' offices." (*Id.*). Goodall's testimony is consistent.

According to Goodall:

A    [W]e kept telling [Appellant] to calm down – if he would calm down, quit fighting, we would let him up because he kept repeatedly saying, "Get the fuck off of me." So that's when we said, "If you stop fighting, you stop – stop fighting, we'll let you up.[”]

Q    Okay. And did you pick [Appellant] up?

. . . . [videoconferencing interrupted here]

A    Coach Davis and I both assisted him up.

(R. 233 (Goodall deposition)).

The Jefferson County Public School (JCPS) report of this incident, compiled by JCPS investigator Krisha Brown, says local police officers arrived and administered two breathalyzer tests. The first test showed a blood alcohol concentration (BAC) of 0.126% and the second a BAC of 0.132%. Both exceeded the minimum standard for intoxication. Law enforcement also tested the contents of Appellant's water bottle and confirmed it contained alcohol. Appellant's mother, Melissa Kurtz, arrived at the school to pick up her son.

The following day, the school contacted Kurtz informing her that the school suspended Appellant for three days because of the incident. The school asked if she wanted the notice of suspension mailed to her or left at school where she could pick it up. She asked that it be mailed and received it eight days later.

Two days after the incident and one day after informing Kurtz of the suspension, an attorney representing Appellant sent a letter to the school appealing the suspension. Appellant availed himself of the full administrative appeals process available and, at each step, the school upheld its decision.

On January 18, 2020, Appellant brought suit in Jefferson Circuit Court. He alleged a battery claim against Goodall and asked the circuit court to review his school suspension. Goodall claimed qualified official immunity.

On May 10, 2021, Appellees moved for summary judgment on Goodall's immunity defense to the first count and also argued summary judgment

was proper on the second count because the suspension was lawful and supported by substantial evidence. The circuit court agreed and entered summary judgment for Appellees on October 5, 2021. This appeal followed.

Additional relevant facts will be found in the analysis.

## STANDARD OF REVIEW

Appellate courts review a circuit court's granting of summary judgment *de novo*. *Cmty. Fin. Servs. Bank v. Stamper*, 586 S.W.3d 737, 741 (Ky. 2019). "An appellate court's role . . . is to determine whether the trial court erred in finding no genuine issue of material fact exist[ed] and the moving party was entitled to judgment as a matter of law." *Feltner v. PJ Operations, LLC*, 568 S.W.3d 1, 3 (Ky. App. 2018). "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 480 (Ky. 1991).

## ANALYSIS

Appellant argues the circuit court erred: (1) by determining Goodall had qualified official immunity; (2) by refusing to exclude certain attachments to the JCPS official report from consideration when weighing whether to grant summary judgment; and (3) by granting summary judgment concerning the school suspension. We address each in turn.

*Qualified Official Immunity*.

"Qualified official immunity applies to the negligent performance by a public officer or employee of . . . acts or functions . . . involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . in good faith . . . within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). "[A]n officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* Appellant attempts to force Goodall's conduct into the latter category – the performance of a ministerial act – but we are not persuaded by his argument.

Appellant cites *Patton v. Bickford* as saying "the general supervision of students by teachers is ministerial in nature 'as it requires enforcement of known rules.'" 529 S.W.3d 717, 727 (Ky. 2016). But *Patton* never said the courts base the ministerial/discretionary distinction "on the status or title of the officer or employee, but on the [act or] function performed." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (quoting *Yanero*, 65 S.W.3d at 521 (citation omitted)). "[I]mmunity issues are resolved by examining 'the nature of the functions with which a particular official . . . has been lawfully entrusted[.]'" *Yanero*, 65 S.W.3d

at 518 (quoting *Forrester v. White*, 484 U.S. 219, 224, 108 S. Ct. 538, 542, 98 L. Ed. 2d 555 (1988)).

Appellant wants this Court to categorize Goodall's acts as student supervision, citing *Patton*, and to hold Goodall to a ministerial duty to refrain from taking any action to restrain him. We hold the nature of this particular official's function was "to provide a safe school environment" for all concerned, including Appellant himself. *Marson v. Thomason*, 438 S.W.3d 292, 299 (Ky. 2014). Providing a safe school environment is "a general and continuing supervisory duty . . . which depend[s] upon constantly changing circumstances . . . ." *Haney*, 311 S.W.3d at 243.

When Appellant was first approached and escorted from the classroom, the circumstances called for little more than verbally directing him to the Assistant Principals' offices. Appellant changed those circumstances in a substantive way when, affected by his own inebriation and contrary to the school officials' reasonable verbal instruction to enter the offices, he decided he would go to the parking lot and enter his vehicle. When verbally instructed again to enter the offices, Appellant disobeyed. Coach Davis placed himself between Appellant and the exit, but Appellant continued to press on, necessarily bringing about contact between himself and the stationary Coach Davis. Goodall had the choice to allow Appellant to continue but, because his duty is to assure student safety, including

-11-

Appellant's safety and that of Coach Davis, he chose a different course. Verbal direction was no longer effective. Appellant's conduct compelled Goodall to exercise the discretion available to him under the law to physically secure Appellant's cooperation in the interest of school safety.

In accordance with KRS 158.444, the Kentucky Board of Education promulgated administrative regulations relating to school safety, student discipline, and related matters. Kentucky Revised Statute (KRS) 158.444(1). Those regulations are at play here.

When Appellant evinced a refusal to follow verbal instruction, Coach Davis placed himself between Appellant and the school parking lot where Appellant intended to enter his vehicle while intoxicated. He even touched Appellant while trying to redirect him into Appellant's designated safe space, the Assistant Principals' offices. This was not physical restraint. "'Physical Restraint' . . . does not include . . . touching . . . for the purpose of encouraging a student to move voluntarily to a safe location . . . [or l]ess restrictive physical contact or redirection to promote student safety . . . ." 704 Kentucky Administrative Regulations (KAR) 7:160 § 1(10). Davis's less restrictive physical contact was ineffective, and Appellant continued to pursue his own unsafe course.

Goodall, observing Appellant's resistance, exercised discretion in determining whether to allow Appellant to evade Davis, exit the building, and enter his vehicle. Goodall chose increasing degrees of physical restraint.

The same regulation just cited also says, "Physical restraint may only be implemented in a public school or educational program if . . . [t]he student's behavior poses an imminent danger of physical harm to self or others and as permitted under . . . 503.070,[2] and 503.110[3] . . . ." 704 KAR 7:160 § 3(3)(a).

---

[2] The relevant portions of this statute state:

(1) The use of physical force by a defendant upon another person is justifiable when:

(a) The defendant believes that such force is necessary to protect a third person against the use or imminent use of unlawful physical force by the other person; and

(b) Under the circumstances as the defendant believes them to be, the person whom he seeks to protect would himself have been justified under KRS 503.050 and 503.060 in using such protection.

KRS 503.070(1)(a), (1)(b).

[3] The relevant portions of this statute state:

(1) The use of physical force by a defendant upon another person is justifiable when the defendant is a parent, guardian, or other person entrusted with the care and supervision of a minor or an incompetent person or when the defendant is a teacher or other person entrusted with the care and supervision of a minor, for a special purpose, and:

(a) The defendant believes that the force used is necessary to promote the welfare of a minor or mentally disabled person or, if the defendant's responsibility for the minor or mentally disabled person is for a special purpose, to further that special purpose or maintain reasonable discipline in a school, class, or other group; and

-13-

Goodall perceived Appellant's behavior as posing an imminent danger of physical harm to Appellant himself and to Davis if he were not subjected to limited physical restraint to prevent escalation of the confrontation between Davis and Appellant. If there is a genuine dispute about that in this record, we fail to see it. But the irresponsibility of allowing an inebriated student to leave school and get behind the wheel of his vehicle, and the attendant risk of danger to the public, is beyond doubt. *Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 151 (Ky. 2003) ("[F]aculty members . . . should have foreseen that students who consumed alcoholic beverages on the premises, then left the premises in their private vehicles . . . were likely to be involved in an accident causing injury or death. . . . [T]hat an alcohol-related accident actually occurred and caused the death of one of the students was neither 'extraordinary' nor 'unforeseeable.'").

We have examined the nature of the functions with which Goodall has been lawfully entrusted and determine, as a matter of law, he was engaged in carrying out a discretionary duty. There are no specific guidelines in laws or regulations giving Goodall a clear directive how to handle a drunk student

---

(b) The force that is used is not designed to cause or known to create a substantial risk of causing death, serious physical injury, disfigurement, extreme pain, or extreme mental distress.

KRS 503.110(1)(a), (1)(b).

physically resisting school officials trying to perform their duty of assuring student safety. Goodall complied with the general guidelines that do apply.

This case is less like *Patton* and much more like *Haney* and *Marson*, each of which also describe "a situation in which an officer performed a governmental act that was 'not prescribed' or was left 'without clear directive.'" *Patton*, 529 S.W.3d at 727 (quoting *Marson*, 438 S.W.3d at 302).

However, there is more to the analysis. *Yanero* requires discretionary actions be undertaken in good faith. 65 S.W.3d at 522 (Immunity protects "good faith judgment calls made in a legally uncertain environment."). It cannot be reasonably disputed that Goodall's actions were within the scope of his employment as security personnel. "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.* at 523. "[T]here must be a causally related 'violation of a constitutional, statutory, or other clearly established right' of the complainant." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 476 (Ky. 2006) (citing *Yanero*, 65 S.W.3d at 522).

Appellant seeks to carry the burden of proving bad faith by insisting he never hit anyone. Our analysis of the immunity issue to this point presumes he

is right. However, Appellant's assertion that he did nothing to precipitate Goodall's actions is not sustained by this record.

When Appellant was cooperating with school officials by obeying their lawful commands, verbal interaction was all that was called for. When Appellant chose not to obey verbal direction and tried to get past Coach Davis and to his vehicle, he precipitated a process of decision-making by two government officials. Doing nothing and allowing Appellant to make it to his vehicle was not a legally wise choice. *See Williams*, 113 S.W.3d at 151. Coach Davis effectuated the least restrictive touching to stop and redirect Appellant in a manner not even categorized as physical restraint under the applicable regulation. If Appellant had obeyed Coach Davis's combined physical and verbal redirection to safety, the episode would have ended with no one harmed. But Appellant chose to resist.

When Appellant refused to obey Coach Davis's physical and verbal redirection into the offices, he precipitated the next level of decision-making by these government officials. Goodall, knowing that Appellant had engaged in fighting in school earlier in the year, did not immediately attempt a standing upper body torso assist but, in accordance with recent training, attempted to redirect Appellant with a bicep assist. If Appellant had accepted that assistance and entered the Assistant Principals' offices, again, the episode would have ended.

Appellant continued to resist. Appellant's actions brought on the next level of decision-making for these officials.

Only after Appellant's repeated determination, in a drunken state of being, to make it to his vehicle did Goodall turn to the standing upper torso assist to get Appellant into the Assistant Principals' offices – the place designated in Appellant's IEP as a safe space. But Appellant resisted again; he refused to go to his safe space.

The three individuals fell to the floor of the school hallway because of Appellant's actions. He does not dispute Goodall's own injuries from that fall. Appellant was charged as a juvenile with Alcohol Intoxication in a Public Place and Assault. (R. 357 (*Commonwealth v. Carpenter*, No. 20-J-700046-001 (Jefferson Dist. Ct. Feb. 17, 2021) (Court Docket))). Those charges were dismissed with prejudice but not before Appellant stipulated to probable cause. (*Id.*).

Stipulating probable cause does not eliminate a genuine dispute over the fact, one way or the other, whether Appellant struck Goodall. *Craycroft v. Pippin*, 245 S.W.3d 804, 806 (Ky. App. 2008). But it did inform the circuit court, and now persuades this Court, that acknowledgment of probable cause that he committed assault supports a ruling that Goodall's actions were not unreasonable and, therefore, not bad faith. The material fact that matters is whether Appellant

resisted efforts to direct him to his safe space in the Assistant Principals' offices. There is no genuine issue regarding that material fact. He admits he did.

If qualified official immunity protects public employees from "bad guesses in gray areas" as said in *Rasche v. Berman*, 491 S.W.3d 182, 189 (Ky. App. 2016), it certainly must protect public officials from unsupported *claims* of bad guesses. *See also Sloas*, 201 S.W.3d at 475 ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks and citations omitted)).

Appellant's representation of the facts does not demonstrate Goodall acted in bad faith. His interpretation of the events as bad faith conduct is not evidentiary but conclusory, uncorroborated, and refuted by the record.

Consequently, the circuit court did not err when it determined Goodall enjoyed qualified immunity as to Appellant's battery claim.

*JCPS Investigator's Report Attachments*.

Next, Appellant claims the circuit court erred when it failed to exclude certain exhibits during the summary judgment hearing because the evidence was inadmissible hearsay. The evidence Appellant challenges is a "JCPS Compliance and Investigations Report" and two attached unsworn statements. We decline to address this argument for two reasons.

First, the applicable rule in this Court requires that every brief "contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." Kentucky Rules of Civil Procedure (CR) 76.12(4)(c)(v). Appellant failed to do that. "If a party fails to inform the appellate court of where in the record his issue is preserved, the appellate court can treat that issue as unpreserved." *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021). We treat this argument as unpreserved.

Second, this Court's *de novo* review of the immunity question did not consider the evidence of which Appellant complains. We reached the conclusion Goodall was entitled to immunity and, therefore, summary judgment was properly granted on that issue. As for its evidentiary value in the administrative proceeding, the unsworn statements were cumulative of other evidence.

*Appellant's School Suspension*.

Lastly, Appellant argues the circuit court erred by granting summary judgment in favor of Appellees in conjunction with the review of Appellant's administrative suspension. Appellant advances two arguments here.

First, Appellant argues he was denied due process because he did not receive timely written notice of his suspension. We are unpersuaded. The record

shows the day after his suspension, Appellant's counsel initiated an appeal. Appellant had actual notice but also waived any objection by initiating the appeal.

Second, Appellant argues he was suspended solely because of his alleged commission of a third-degree assault and that dismissal of that charge removed all the basis for the suspension. Again, we are not persuaded.

When reviewing a school's decision to suspend a student, the standard of review is whether the school's decision was arbitrary and not supported by the substantial evidence. *Fankhauser v. Cobb*, 163 S.W.3d 389, 400-01 (Ky. 2005). Pursuant to KRS 158.150(1), students may be suspended for "use of profanity or vulgarity," "use or possession of alcohol or drugs," and "abuse of school personnel[.]" KRS 158.150(1). The school had more than substantial evidence to support the suspension. Multiple officials gave consistent evidence, as memorialized by the JCPS official report, supporting the facts of Appellant's intoxication, his own admission of profanity, and his altercation that led to Goodall's suffering a cut to his forehead and a black eye.

The record shows there is substantial evidence supporting Appellant's suspension, notwithstanding the prosecutor's decision to drop formal charges a year later. The school's decision was not arbitrary even when considering all the evidence in a light most favorable to Appellant.

The circuit court did not err when granting summary judgment in favor of Appellees on this claim.

## **CONCLUSION**

For the foregoing reasons, we affirm the Jefferson Circuit Court order granting summary judgment in favor of Appellees.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Andrew E. Mize
Louisville, Kentucky

BRIEF FOR APPELLEES:

Mark S. Fenzel
Kevin L. Chlarson
Louisville, Kentucky