RENDERED: APRIL 24, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0798-MR

CVS PHARMACY, INC.                                          APPELLANT


                        APPEAL FROM PERRY CIRCUIT COURT
v.                      HONORABLE ALISON C. WELLS, JUDGE
                        ACTION NO. 15-CI-00115


JAMES DUSTIN CHANEY, D.O. AND
RITE AID OF KENTUCKY, INC.                                  APPELLEES

AND


NO. 2024-CA-0962-MR

JAMES DUSTIN CHANEY                                     CROSS-APPELLANT


                        CROSS-APPEAL FROM PERRY CIRCUIT COURT
v.                      HONORABLE ALISON C. WELLS, JUDGE
                        ACTION NO. 15-CI-00115


CVS PHARMACY, INC.                                      CROSS-APPELLEE

** ** ** ** **

BEFORE: CETRULO, L. JONES, AND MCNEILL, JUDGES.

MCNEILL, JUDGE: Following a jury trial in which the jury found in favor of James Dustin Chaney, D.O. ("Chaney") on his negligence and false light claims against CVS Pharmacy, Inc. ("CVS"), the Perry Circuit Court entered a judgment against CVS in the amount of $7,560,000.00, which was later reduced to $2,160,000.00. CVS appeals, arguing it was entitled to a directed verdict on Chaney's claims. Chaney cross-appeals the reduction of his damage award. Because we find that the trial court erred in denying CVS's motion for a directed verdict, we reverse the circuit court's judgment and dismiss Chaney's cross-appeal as moot.

## BACKGROUND

Chaney is a former practicing physician from Eastern Kentucky. In 2011, the Kentucky Board of Medical Licensure ("KBML") began investigating Chaney's prescribing habits for controlled substances. Based upon Chaney's

KASPER[1] data, KBML pharmacy consultant Chris Johnson identified sixteen of Chaney's patients based on "age, addictive drug combinations, distance traveled to the pharmacy, polypharmacy, duplicate refills, and similar last names" and recommended further investigation by the KBML. A physician consultant reviewed the sixteen patient charts and found that Chaney's care fell below the acceptable standard in eleven charts regarding diagnosis, in ten regarding treatment, and in four regarding recordkeeping. The consultant also found that Chaney had demonstrated gross negligence in ten of the patient charts reviewed. On December 12, 2012, the KBML and Chaney entered into an agreed order, which found that Chaney had violated KRS[2] 311.595 and KRS 311.597 and required, among other things, that Chaney keep a controlled substances log and complete further training on prescribing controlled substances.

Contemporaneous with the KBML investigation, state and federal law enforcement were looking into Chaney's pain management clinic, Clarion. In 2015, Chaney was federally indicted on multiple charges in connection with his ownership of Clarion, including conspiracy to distribute and dispense controlled substances unlawfully. Ultimately, Chaney pled guilty to one count of conspiracy

---

[1] The Kentucky All Schedule Prescription Electronic Reporting ("KASPER") System is an electronic system established by Kentucky Revised Statutes ("KRS") 218A.202 to monitor prescriptions of controlled substances.

[2] Kentucky Revised Statutes.

to commit money laundering and was sentenced to thirty months in federal prison. Based upon his conviction, Chaney agreed to surrender his medical license in lieu of revocation.

Amid the federal prosecution, Chaney learned that CVS had filled prescriptions under his Drug Enforcement Administration ("DEA") number that he did not write. Chaney contacted CVS and requested that they perform an audit of all prescriptions written by Chaney and two other physicians with the same last name, James "Ace" Chaney (Chaney's uncle), and George Chaney (apparently unrelated). As a result of their investigation, CVS identified 101 prescriptions that had been falsely attributed to Chaney in KASPER.

In March of 2015, Chaney filed a lawsuit against CVS in Perry Circuit Court, alleging that CVS was negligent in misattributing prescriptions to Chaney written by other medical providers and then reporting those misattributions to KASPER.[3] The lawsuit further alleged that CVS's negligence caused Chaney to be investigated by the KBML and state and federal authorities, to be indicted, and to lose his license. An amended complaint later added a false light claim. Chaney sought damages for emotional pain and suffering and impairment of his ability to earn income.

---

[3] The lawsuit also named Rite Aid, local pharmacy R/X Discount Co., several CVS and Rite Aid pharmacists, and some John Does.

Following a jury trial, the jury found in Chaney's favor and awarded $7,560,000.00 in damages, which was later reduced to $2,160,000.00. This appeal and cross-appeal followed.

## STANDARD OF REVIEW

CVS argues the trial court erred in denying their motion for a directed verdict on Chaney's negligence and false light claims. "Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict." *Lewis v. Bledsoe Surface Min. Co.*, 798 S.W.2d 459, 461 (Ky. 1990). A motion for directed verdict "raises only questions of law as to whether there is *any* evidence to support a verdict." *Harris v. Cozatt, Inc.*, 427 S.W.2d 574, 575 (Ky. 1968) (emphasis added). "[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18–19 (Ky. 1998) (citation omitted).

"All evidence which favors the prevailing party must be taken as true and . . . [t]he prevailing party is entitled to all reasonable inferences which may be drawn from the evidence." *Lewis*, 798 S.W.2d at 461. "[A] directed verdict is appropriate where there is no evidence of probative value to support an opposite

result because [t]he jury may not be permitted to reach a verdict upon speculation or conjecture." *Toler v. Süd–Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014), *as corrected* (Apr. 7, 2015) (internal quotation marks and citation omitted). Finally, "[a]ppellate review of the trial court's denial of a motion for directed verdict is not limited to evaluating the reasons proffered by the trial court for its denial." *Louisville Metro Government v. Ward*, 610 S.W.3d 295, 307 (Ky. App. 2020). "Rather, we must make our own review of the entire record to determine whether the trial court's ruling was clearly erroneous." *Brooks v. Lexington-Fayette Urban Cnty. Housing Auth.*, 132 S.W.3d 790, 798 (Ky. 2004).

## ANALYSIS

As to Chaney's negligence claim, CVS contends it was entitled to a directed verdict because Chaney failed to prove that its negligence was the cause of his injuries. "The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) (citation omitted). "The absence of proof on any one of the required elements is fatal to a negligence claim." *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 542 (Ky. App. 2013) (citing *M & T Chemicals, Inc. v. Westrick*, 525 S.W.2d 740, 741 (Ky. 1974)).

Traditionally, "causation [has] consist[ed] of two distinct components: 'but-for' causation, also referred to as causation in fact, and proximate causation." *Patton*, 529 S.W.3d at 730. "But-for causation requires the existence of a direct, distinct, and identifiable nexus between the defendant's breach of duty (negligence) and the plaintiff's damages such that the event would not have occurred 'but for' the defendant's negligent or wrongful conduct in breach of a duty." *Id.* "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." *Id.* (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176–77 (2009)).

"Proximate causation captures the notion that, although conduct in breach of an established duty may be an actual but-for cause of the plaintiff['s] damages, it is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability upon the defendant." *Id.* at 731. "Proximate cause is bottomed on public policy as a limitation on how far society is willing to extend liability for a defendant's actions[.]" *Id.* (quoting *Ashley County, Arkansas v. Pfizer, Inc.*, 552 F.3d 659, 671 (8th Cir. 2009)).

CVS argues that Chaney's negligence claim fails as a matter of law because both components are absent here. We confine our analysis to the "but-for" or cause-in-fact element of causation because we believe it is dispositive. In Kentucky, the "but-for" or cause-in-fact component of causation has been

subsumed by the "substantial factor" test in the Restatement (Second) of Torts § 431. *Lewis v. B & R Corporation*, 56 S.W.3d 432, 437 (Ky. App. 2001). This section states in pertinent part that an "actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm[.]" RESTATEMENT (SECOND) OF TORTS § 431 (1965). Comment (a) to § 431 explains what is meant by "substantial factor":

> In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . . [T]his is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

As recognized by the comment, under the "substantial factor" test, a plaintiff must still prove that his injury would not have occurred but for defendant's negligence. Thus, the question of whether a defendant's conduct was a substantial factor in bringing about the plaintiff's harm "does not arise if the testimony clearly proves that the harm is from a cause other than the actor's negligence." RESTATEMENT (SECOND) OF TORTS § 431 (1965) cmt. b. "It is only

-8-

where the evidence permits a reasonable finding that the defendant's conduct had some effect that the question whether the effect was substantial rather than negligible becomes important." *Id.*

It is the court's duty to determine "whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 92 (Ky. 2003) (quoting RESTATEMENT (SECOND) OF TORTS § 431(1)(a)) (internal quotation marks omitted). If the defendant's conduct is unrelated to plaintiff's harm, or "when the matter remains one of pure speculation and conjecture . . . it becomes the duty of the court to direct a verdict for the defendant." RESTATEMENT (SECOND) OF TORTS § 433B (1965) cmt. a. On appeal, the question for this Court is whether reasonable minds could differ as to whether CVS's misattributing controlled substance prescriptions to Chaney was a substantial factor in causing his injuries—specifically, investigation by the KBML and federal law enforcement, and the subsequent loss of his medical license and imprisonment.

Here, the evidence does not support any reasonable inference that misattributions by CVS were a substantial factor in causing Chaney's injuries. Regarding the KBML investigation, pharmacy consultant Chris Johnson testified that he reviewed Chaney's KASPER in 2011 at the KBML's request. However, he

was unaware of any investigation into Chaney based on misattributed prescriptions. In fact, the record is silent as to why KBML requested Johnson to investigate Chaney. Even Chaney admitted on cross-examination that he did not know why Johnson began his investigation, and he does not know that misattributions led to any investigation of him by any Kentucky state authority.

KBML representative Leanne Diakov testified that its investigation was not based on misattributions. In fact, she testified that the KBML did not even look at Chaney's KASPER report. Although Johnson identified sixteen patient names from Chaney's KASPER and referred them to the KBML for further investigation, the KBML only looked at the medical records of the sixteen patients when determining whether Chaney had complied with the standard of care.

While Chaney's brief claims that he put on "more than enough evidence for a jury to conclude that CVS harmed Chaney," the "evidence" he cites is problematic. He points to the testimony of his pharmacy expert, Dr. Dering-Anderson, himself, and KBML pharmacy consultant Chris Johnson as establishing that "CVS's false data was input into its computer system which was then sent to KASPER and other repositories; that those repositories flagged Chaney as a 'top prescriber' of opioids based on the false data, and that Chaney was investigated as a result of this distinction by the [KBML]."

The "other repositories" mentioned, which flagged Chaney as a "top prescriber of opioids," were Doximity, ProPublica, and the Center for Medicaid Services. Chaney testified to an exhibit that he had prepared with data from these three repositories, which suggested that he had prescribed substantially more controlled substances than he says he did. The issue with this evidence, however, is that Chaney failed to link any claimed misattributions from these databases to CVS.

Further, Chaney was not "investigated as a result of this distinction" (being a 'top prescriber of opioids'), as he asserts. In support of this proposition, he cites the two patients that pharmacy consultant Chris Johnson identified from his KASPER, which Chaney claims were misattributed to him. One of these patients, J.S., was misattributed by a different pharmacy and is therefore not relevant to CVS's negligence.

Misattribution of the other, H.K., is purely speculative. Chaney's argument goes like this: the report issued by KBML's medical consultant indicates that Chaney saw H.K. on 11/16/2011 and prescribed her Oxycodone, Gabapentin, and Tizanidine. However, this is not reflected in Chaney's KASPER report. Ergo, the 2011 prescriptions must have been misattributions that have since been corrected.

This is simply a bridge too far. "Liability must rest on a more solid basis than speculation and surmise." *Texaco, Inc. v. Standard*, 536 S.W.2d 136, 138 (Ky. 1975). Even assuming the H.K. prescription was a misattribution, it was not a substantial factor in bringing about Chaney's harm because KBML's medical consultant, Dr. Surinder Kad, found that Chaney's care regarding this patient complied with minimum standards.

Similarly, no evidence suggests controlled substance prescriptions misattributed by CVS were a substantial factor in causing Chaney to be investigated and indicted by federal authorities. John Couch, a retired deputy from the Perry County Sheriff's Office, testified that the investigation was initiated when a concerned citizen made an anonymous complaint about Clarion to the Kentucky State Police headquarters in Frankfort. Frankfort requested that Perry County's Kentucky State Police Drug Enforcement section look into Clarion, so Couch conducted surveillance on the clinic and observed cars from out of state and people mingling in the parking lot. He relayed this information to his superior, and the investigation was ultimately passed to the FBI. Couch testified his investigation had nothing to do with KASPER data.

Testimony from Assistant U.S. Attorney Roger West confirmed Couch's version of events. West testified that the investigation stemmed from complaints from state and federal law enforcement that had conducted surveillance

at Clarion. West further stated that the Clarion investigation was not based on any erroneously attributed prescriptions in the KASPER database and that Chaney was investigated based solely upon his ownership of Clarion.

Chaney claims he was indicted for being a "pill-mill" doctor "[b]ased on a search warrant which relied entirely upon KASPER," but again, this is beyond the evidence. While the affidavit submitted by the FBI in support of its search warrant references Chaney's KASPER, it can hardly be said that the search warrant "relied entirely upon KASPER." In fact, only one paragraph of the sixty-four-page affidavit concerns Chaney's KASPER. The remainder of the affidavit sets forth the FBI's detailed investigation into Clarion, including interviews with seven former patients, a former physician employee, and a former compliance officer, as well as the results of months of surveillance.

But even if the FBI considered the KASPER data, Chaney bore the burden of proving that it was more likely than not that CVS misattributions were a substantial factor in bringing about his harm. *See Standard*, 536 S.W.2d at 138. The affidavit states that the FBI reviewed Chaney's KASPER data from December 2010 to December 2012, which indicated that Chaney was prescribing "very large" amounts of controlled substances. CVS concedes that it misattributed 23 controlled substance prescriptions to Chaney from 2010 to 2012. However, Chaney's KASPER data shows that he wrote close to 14,000 controlled substance

prescriptions during this period. It is unreasonable to infer that the 23 misattributions by CVS proven at trial were a substantial factor in causing the FBI to indict Chaney. Especially considering the multitude of other evidence outlined in the affidavit—extended surveillance of Clarion, interviews with its former patients, and even one of its former physicians—which suggested criminal activity may be taking place at Clarion. While possible, it is simply not probable. *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) ("[E]vidence of causation must be in terms of probability rather than mere possibility[.]").

But even more fundamentally, Chaney failed to prove that his indictment would not have occurred but for the misattributions by CVS. "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." *Gross*, 557 U.S. at 176–77 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* 265 (5th ed. 1984)). Here, there is no evidence, or even a reasonable inference, that Chaney would not have been investigated or indicted but for any misattributions by CVS. Such a conclusion could only be reached by speculation. However, "speculation and supposition are insufficient to justify a submission of a case to the jury, and . . . the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise and speculation." *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) (citation omitted).

As an extension of the above, Chaney failed to prove that any misattributions by CVS caused him to lose his medical license, lose his ability to prescribe controlled substances, or go to prison. The evidence clearly showed that these results were the direct consequences of Chaney's conviction for conspiracy to commit money laundering. Chaney stipulated in the 2016 agreed order of surrender to pleading guilty to conspiracy to commit money laundering, engaging in conduct which violates Kentucky law, and that, pursuant to 201 KAR[4] 9:081, the facts underlying his conviction relate to controlled substances. Diakov testified that the KBML was required by law to suspend a practitioner's ability to prescribe controlled substances when they have been convicted of a crime involving controlled substances. She further testified that Chaney's surrender of his license was based solely upon his guilty plea. In sum, Chaney failed to prove that any misattributions by CVS were the legal cause of his harm, and "the jury could not have reasonably reached its verdict on the basis of the evidence before it." *Belt v. Cincinnati Insurance Company*, 664 S.W.3d 524, 530 (Ky. 2022) (internal quotation marks and citation omitted). Therefore, the circuit court erred in denying CVS's motion for directed verdict on Chaney's negligence claim.

CVS also argues the trial court should have directed a verdict on Chaney's false light claim. In *McCall v. Courier–Journal and Louisville Times*

---

[4] Kentucky Administrative Regulations.

*Co.*, 623 S.W.2d 882 (Ky. 1981), our Supreme Court adopted the Restatement

(Second) of Torts § 652E (1976), which sets forth the requirements for a false light

claim as follows:

> One who gives publicity to a matter concerning another
> that places the other before the public in a false light is
> subject to liability to the other for invasion of his privacy,
> if
>
>> (a) the false light in which the other was placed would
>> be highly offensive to a reasonable person, and
>>
>> (b) the actor had knowledge of or acted in reckless
>> disregard as to the falsity of the publicized matter
>> and the false light in which the other would be
>> placed.

"Publicity" means that "the matter is made public, by communicating

it to the public at large, or to so many persons that the matter must be regarded as

substantially certain to become one of public knowledge." RESTATEMENT

(SECOND) OF TORTS § 652D cmt. a (1976). Examples of publicity include:

"publication in a newspaper or a magazine, even of small circulation, or in a

handbill distributed to a large number of persons, or any broadcast over the radio,

or statement made in an address to a large audience[.]" *Id.* However, it is not

enough "to communicate a fact concerning the plaintiff's private life to a single

person or even to a small group of persons." *Id.* "The distinction, in other words,

is one between private and public communication." *Id.* "The purpose of

a false light action is to protect the individual in not being made to appear before

-16-

the public in an unreasonably objectionable false light and otherwise than as he is." *McCall*, 623 S.W.2d at 888 n.9 (citing RESTATEMENT (SECOND) OF TORTS § 652E cmt. b (1976)).

In his second amended complaint, Chaney alleged that due to misattributions by CVS, he "appeared falsely to the public as having written large amounts of controlled substance prescriptions." CVS contends Chaney's false light claim fails as a matter of law because he failed to prove that the misattributions were communicated to the public at large or placed him in a false light that would be highly offensive to a reasonable person. We agree.

As for publicity, the evidence at trial was that communication of individual prescription data (including any prescriptions misattributed to Chaney) was limited to three recipients: KASPER, third-party payors such as insurance companies, and the patients themselves. None of these communications satisfies the publicity requirement of a false light claim. As noted above, publicity means that the matter is "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." RESTATEMENT (SECOND) OF TORTS § 652D cmt. a (1976).

KASPER data is not available to the general public and is protected by statute. *See Williams v. Commonwealth*, 213 S.W.3d 671, 683 (Ky. 2006); KRS

-17-

218A.202(6)(a) & (b).   Similarly, prescription data transferred to insurance companies is confidential under HIPAA.  *See* 45 C.F.R.[5] §§ 160.102, 160.103, 164.502(a).  "These restrictions negate the assumption that the matter was substantially certain to become one of public knowledge."  *Moore v. Big Picture Co.*, 828 F.2d 270, 274 (5th Cir. 1987) (holding that communications that could only be accessed in accordance with the Freedom of Information Act, 5 U.S.C.[6] § 552(a)(3) (1977), were not public).  While Chaney claims that the prescription data communicated by CVS to KASPER and insurance companies "then flows to various databases and publicly available sources of information[,]" we are unaware of any evidence confirming this assertion.[7]

Finally, a communication to a patient via the label on their prescription pill bottle is a private communication.  *See* RESTATEMENT (SECOND) OF TORTS § 652D cmt. a (1976) ("[I]t is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.").  This is true even though misattributions were sent to 101 individual patients.  *See Sherr v. HealthEast Care System*, 262 F. Supp. 3d 869, 881 (D. Minn. 2017) (holding that hospital's disclosure of information to

---

[5] Code of Federal Regulations.

[6] United States Code.

[7] We have reviewed Chaney's citation to the video record (VR 03/08/23 at 14:23:50) and find no support for this claim.

-18-

35-40 medical practitioners did not constitute publicity); *Cohen v. Beachside Two–I Homeowners' Ass'n*, No. 05-706, 2005 WL 3088361, at *17 (D. Minn. Nov. 17, 2005) (holding that distribution to "a small community of about fifty households in a small geographic area" was not to the public at large).  As noted by the Restatement, "[t]he distinction . . . is one between private and public communication."  RESTATEMENT (SECOND) OF TORTS § 652D cmt. a.  As examples of public communication, the Restatement lists "any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience[.]"  *Id.*

Information communicated on a patient's prescription pill bottle is essentially private.  The nature of the communication does not change—from private to public—simply because of the number of private communications.  This is particularly true here, where there is no evidence that any one patient knew of any other patient's misattributed prescription.  Again, the relevant question is whether the communication was "to so many persons that the matter must be regarded as *substantially certain* to become one of public knowledge."  RESTATEMENT (SECOND) OF TORTS § 652D cmt. a (1976) (emphasis added).  Given the substance of the communications at issue, we cannot say it was substantially

certain that any prescriptions misattributed to Chaney would become public knowledge.

Even if Chaney could prove the publicity aspect of his false light claim, he has failed to show that any misattributions painted him in a false light that would be highly offensive to a reasonable person. First, Chaney has failed to show that the 101 misattributions attributed to CVS cast him in a false light, or in other words, "otherwise than he is." RESTATEMENT (SECOND) OF TORTS § 652E cmt. b (1976). Chaney's second amended complaint alleges that the misattributions made him "appear[] falsely to the public as having written large amounts of controlled substance prescriptions." But Chaney's KASPER data from the relevant period (2010-2014) shows that he wrote over 21,000 controlled substance prescriptions. By any standard, Chaney did write a "large amount of controlled substance prescriptions." And while Chaney disputes the reliability of this number, he has not put forth any evidence suggesting it was so much lower that the 101 misattributions by CVS somehow tipped the balance and made him appear to the public otherwise than he is.

Additionally, he has not shown that the misattributions would be "highly offensive" to a reasonable person. This means that Chaney "would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." A reasonable person in Chaney's position, someone who had

-20-

written over 21,000 controlled substance prescriptions, would not be highly offended by having 101 controlled substance prescriptions misattributed to him. This comparatively small number would not make a reasonable person in Chaney's position worry that people would think that they overprescribed controlled substances. Especially since here the only members of the public who would have seen these misattributions were the individual patients who received the prescriptions, and it is unlikely they would have attributed them to Chaney rather than to CVS. Further, absent evidence to the contrary, each patient presumably was aware of only a single misattribution and therefore would not have assumed that Chaney was an overprescriber simply on that fact. In sum, Chaney failed to introduce sufficient evidence to convince a reasonable juror that CVS gave "publicity" to any misattributions and that those misattributions would be "highly offensive" to a reasonable person, as required for a false light claim.

Here, the jury's verdict was so palpably against the evidence that we can only conclude "it was reached as a result of passion or prejudice." *Bierman*, 967 S.W.2d at 19. Certainly, Chaney's story is tragic. He was presented as a small-town doctor who lost everything. The jury heard how Chaney was investigated, indicted, and made to sit in prison in solitary confinement. They heard how he had to give up doing what he loved and now makes pizzas for meager wages. They heard how large, corporate pharmacies, including CVS,

misattributed controlled substance prescriptions to Chaney. But what they did not hear was sufficient evidence to satisfy the elements of Chaney's negligence and false light claims, as set forth above. We do not take reversing the jury's verdict lightly. "Clearly, the sanctity of the jury verdict is fundamental in our judicial system." *Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.*, 179 S.W.3d 785, 790 (Ky. 2005). However, at the same time, when there is "no evidence of probative value to support [a] . . . result[,]" a directed verdict is appropriate, because "[t]he jury may not be permitted to reach a verdict upon speculation or conjecture." *Toler*, 458 S.W.3d at 285 (citation omitted). Here, there was insufficient evidence for a reasonable juror to conclude that CVS's negligence caused Chaney's injuries or placed him in a false light, and the circuit court should have directed a verdict in CVS's favor.

Finally, Chaney cross-appeals the trial court's reduction of his damage award. Because we have found the trial court erred in failing to grant a directed verdict for CVS on Chaney's claim, this issue is now moot. Therefore, we decline to address it.

## CONCLUSION

Based on the foregoing, the judgment of the Perry Circuit Court is reversed, and the case is remanded with instructions to dismiss Chaney's complaint. Chaney's cross-appeal is dismissed as moot.

ALL CONCUR.

BRIEFS FOR APPELLANT/CROSS-APPELLEE CVS PHARMACY, INC.:

S. Chad Meredith
G. Luke Burton
F. Maximilian Czernin
Cincinnati, Ohio

Darryl W. Durham
Louisville, Kentucky

Randall Scott May
Hazard, Kentucky

Jonathan W. Garlough
Chicago, Illinois

Anne-Louise T. Mittal
Milwaukee, Wisconsin

BRIEFS FOR APPELLEE/CROSS-APPELLANT JAMES DUSTIN CHANEY:

J. Dale Golden
Laraclay Parker
Cody P. McIlvoy
Lexington, Kentucky